**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KATHIE COSTANICH,
                *Plaintiff-Appellant,*

v.

DEPARTMENT OF SOCIAL AND HEALTH
SERVICES FOR THE STATE OF
WASHINGTON; SANDRA DURON; JOHN
DOE DURON; CAROL SCHMIDT; JOHN
DOE SCHMIDT; BEVERLY PAYNE;
JOHN DOE PAYNE; JAMES BULZOMI;
JANE DOE BULZOMI; ROBERT STUTZ;
INGRID MCKENNY; JOHN DOE
MCKENNY; JANE DOE STUTZ,
                *Defendants-Appellees.*

No. 08-35217

D.C. No.
2:05-cv-00090-MJP

KATHIE COSTANICH,
 *Plaintiff-Appellee-Cross-Appellant,*

v.

DEPARTMENT OF SOCIAL AND HEALTH
SERVICES FOR THE STATE OF
WASHINGTON; SANDRA DURON; JOHN
DOE DURON; CAROL SCHMIDT; JOHN
DOE SCHMIDT; BEVERLY PAYNE;
JOHN DOE PAYNE; JAMES BULZOMI;
JANE DOE BULZOMI; ROBERT STUTZ;
INGRID MCKENNY; JOHN DOE
MCKENNY; JANE DOE STUTZ,
        *Defendants-Appellants-Cross-
                        Appellees.*

No. 08-35287

D.C. No.
2:05-cv-00090-MJP

OPINION

19163

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
May 6, 2009—Seattle, Washington

Filed December 3, 2010

Before: Kim McLane Wardlaw, Richard A. Paez, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Wardlaw

## COUNSEL

Carol Farr, Law Office of Leonard W. Moen, Renton, Washington, for appellant Kathie Costanich.

Pamela H. Anderson, Assistant Attorney General, Olympia, Washington, for appellees State of Washington, et al.

## OPINION

WARDLAW, Circuit Judge:

Washington state revoked Kathie Costanich's foster care license and instituted guardianship termination proceedings against her following an investigation by a Department of Social and Health Services ("DSHS") social worker, Sandy Duron, which purportedly revealed "emotional abuse" of the children in Costanich's care. Finding fundamental inaccuracies in the investigation, an administrative law judge ("ALJ") reversed the license revocation. The Court of Appeals of Washington ultimately upheld the ALJ's determination. *Costanich v. Wash. State Dep't of Soc. & Health Servs.*, 138 Wash. App. 547, 156 P.3d 232 (App. Ct. 2007).

This appeal arises from Costanich's § 1983 claim against Duron, DSHS,[1] and other DSHS officials for deprivation of her due process rights to her foster care license and guardianship of her dependents. Costanich appeals the grant of summary judgment in favor of all DSHS personnel on the basis of absolute and qualified immunity. We must decide whether the DSHS officials are entitled to absolute or qualified immunity for the separate acts of the investigation, the declaration

---

[1]The district court previously dismissed Costanich's claim against DSHS, holding that the agency is not a "person" subject to § 1983 liability. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Costanich does not appeal this dismissal.

filed in support of the guardianship termination, and the revocation of Costanich's foster care license. We affirm the judgment for all DSHS officials, including for conduct related to the revocation of Costanich's foster care license.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Costanich and her husband have been foster parents since 1983 "for some of the neediest and most difficult foster children in the system." *Costanich*, 156 P.3d at 234. As the Court of Appeals of Washington noted,

> All of these children had been victims of abuse or neglect and many had severe behavioral, developmental, and medical problems. [Kathie] specialized in violent, sexually aggressive youth (SAY) and medically fragile infants. Costanich was also the president of Foster Parents of Washington State (FPAWS) and a trainer for DSHS. Before the abuse allegations, the most recent state evaluation described the Costanich foster home as a "unique and valuable resource . . . unsurpassed by any foster home in the State."

*Id.* As of July 2001, the Costanich house was home to six children—three male foster children, K. (age 15), J. (age 12), and P. (age 10); one male under dependency guardianship,[2] F. (age 17); and two sisters also under dependency guardianship, E. (age 8) and B. (age 4).[3] E. and B. had resided in the Costanich home since their infancy.

---

[2]A "dependency guardian" is a person who is "appointed by the court . . . for the limited purpose of assisting the court in the supervision of the dependency," Wash. Rev. Code § 13.34.030(5), whereas a legal "guardian" is a person who "has the legal right to custody of the child pursuant to [an] appointment," id. § 13.34.030(8).

[3]We reference the children only by their first initials to protect their privacy.

During a session with his therapist in July 2001, K. alleged that Costanich was physically and emotionally abusing the children. Sandy Duron, a social worker for the Child Protective Services ("CPS") section of DSHS, initiated an investigation based upon the therapist's referral. She interviewed all of the children, aides who worked in the Costanich home, some of the children's therapists, family and friends, and Costanich herself.[4] Duron reported that all of the children claimed Costanich used profanity regularly, and all but one claimed that she directed profanity at the children and used physical violence. All of the adult interviewees also admitted that Costanich used profanity, but they differed on whether it was directed at the children and whether Costanich used physical violence.

Duron also reported that K. specifically told his therapist about an incident that allegedly took place while the family was vacationing at a cabin on Lake Cavanaugh. According to Duron, K. said that Costanich observed an altercation between F. and a sixteen-year-old female aide, restrained F. by putting her hands around F.'s neck and choking him, and said "I'll kill you, bastard." Duron reported that F.'s account of the incident was basically the same, and that a friend of the family who witnessed the incident and Costanich herself reported that Costanich physically restrained F., though their accounts varied as to the severity of the restraint. According to Duron, K. also told his therapist that Costanich got mad at P. and told him to move his "black ass"[5] and clean his room. K. also heard Costanich call E. a "cunt" and saw her grab E.'s hair.

_____

[4]None of the interviews was recorded and all but one were conducted without a third person present. Moreover, Duron did not produce her handwritten notes of the meetings. In addition to her final report of the investigation, Duron produced only "service episode reports"—electronic summaries prepared by Duron from her handwritten notes.

[5]Costanich admitted that she told P., the only African American child in the house, to "move his black ass," explaining that she was told by an African American friend of hers that that is how his biological mother would speak to him.

Duron also reported that J. told her that he saw Costanich rub urine-soaked sheets in P.'s face.

Dr. Cartwright, a clinical psychologist who reviewed the DSHS records but did not interview the children, opined that swearing at children may lead to or exacerbate behavioral problems. DSHS held meetings in which the Costanich case was discussed. Based upon the meetings, interviews, and consultations, Duron concluded that the allegation of emotional abuse was "founded" and that the allegation of physical abuse was "inconclusive."

In the fall of 2001 and spring of 2002, J.'s, K.'s, E.'s, and B.'s therapists wrote to DSHS, reporting that the children were doing very well in the Costanich home and strongly recommending against removal.[6] Specifically, J.'s therapists, Dr. Cowles and Dr. Adler, prepared a sworn letter describing in detail J.'s disabilities, his substantial improvements in the Costanich home, their strong disagreement with the decision to remove J. from the Costanich home, and "not[ing] that DCFS did not, in a reasonable manner, consult with his providers on how this removal from the foster home was to be conducted even though this was court-ordered." E.'s and B.'s therapist, Dr. Vincent, prepared a sworn letter describing the loving and nurturing relationship between the girls and Costanich and noting the vast "emotional damage that remov-

---

[6]Along with certain letters from witnesses, several of the therapists' letters were the subject of defendants' motion to strike on the ground that letters not signed under penalty of perjury should be excluded under Federal Rule of Civil Procedure 56(e). The district court admitted the unsworn, but dated, letters, not for the truth of the matter asserted, but "to show what evidence DSHS had before it." The court excluded the undated, unsworn letters. DSHS officials challenge the limited admission of the unsworn, but dated, letters for the first time in their cross-reply brief. Because the argument was not made in the opening cross-appeal brief, we consider it waived. *See Martinez-Serrano v. INS*, 94 F.3d 1256, 1259 (9th Cir. 1996). In any event, the district court did not abuse its discretion in admitting the evidence.

ing them will cause the children." K.'s therapist, Dr. Crabbe, wrote of the stability of the Costanich home and the progress that K. had made there, and noted that "[a] change in placement . . . would be detrimental to K.'s emotional and mental health."

The record also reflects that at least six adult witnesses wrote to DSHS, stating that Duron was a hostile interviewer who twisted their words and attributed to them statements they did not make. For example, Tori McLaughlin, a family friend, wrote that Duron asked her the same questions repeatedly when she did not receive the answer she wanted. Diane Isley, a Court Appointed Special Advocate ("CASA") who has worked with Costanich for a decade, prepared a sworn letter stating that Duron attributed to her a false statement about a child running from the Costanich home.

These letters did not cause DSHS to alter its conclusion of "founded" emotional abuse. DSHS informed Costanich of this finding in a meeting in November 2001. According to the testimony of several officials, DSHS also told her that if she would not appeal the finding of emotional abuse and would agree to participate in a corrective management plan, DSHS would not seek termination of her guardianship of E. and B.[7] It is unclear from the record whether DSHS ever made a formal offer and, if so, whether Costanich considered it.

DSHS made its formal finding of emotional abuse in a December 18, 2001, letter addressed to Costanich and signed

---

[7]Defendants moved to strike this evidence on the ground that the proposal constituted an inadmissible settlement offer. *See* Federal Rule of Evidence 408(a)(1). The district court ruled that the evidence was not offered as proof of liability "but to show that DSHS inappropriately pressured [Costanich] to accept its abuse finding." DSHS waived its challenge to the district court's ruling by failing to raise it in the opening brief. *See Martinez-Serrano*, 94 F.3d at 1259. Again, even if DSHS had properly preserved this challenge, we would conclude that the district court did not abuse its discretion in admitting the evidence.

by defendant CPS Investigations Supervisor Beverly Payne. A CPS Section Manager, Kyle Smith, upheld the finding on March 14, 2002, even though his office had contacted several of the witnesses who told CPS of their complaints as to Duron's investigation. Costanich requested an administrative hearing on March 24, 2002. On March 28, 2002, the State filed a petition to terminate Costanich's guardianship of E. and B. The petition was supported by Duron's declaration that Costanich "uses profanity, name-calling, and derogatory racial terms as means to discipline and intimidate the children." Before the state court could issue a decision, the Kalispel Tribe of Indians, of which E. and B. are members, intervened and assumed jurisdiction of their cases. The Tribe placed the girls with relatives for the summer of 2002, and then returned the girls to Costanich.[8] In August 2002, DSHS, acting through defendant licensor Ingrid McKinney, revoked Costanich's foster license. Defendant James Bulzomi reviewed the revocation decision and signed the revocation letter. Costanich's other foster children, except for F., who was also under a dependency guardianship, were removed.

In the fall of 2002 and winter of 2003, the ALJ held nineteen days of evidentiary hearings. Forty-nine witnesses testified, including P., J., Duron, Costanich, various DSHS officials, therapists, and Costanich's aides. The ALJ reversed DSHS's license revocation determination, concluding that the finding of emotional abuse was not supported by substantial evidence. Based on live witness testimony, the ALJ found that Costanich used profanity around the children, but did not direct it at them, though she did ask P. to move his "black ass." The ALJ found K.'s statements to his therapist and Duron's statements and reports not credible due to the unaddressed inconsistencies.

---

[8]E. and B. have remained with Costanich since then. Because the Tribe does not allow adoptions of its members, it granted Costanich guardianship of E. and B. in November 2005.

DSHS appealed the ALJ decision to the DSHS Board of Appeals, which reversed. Relying primarily on Duron's report and on her claim that she recorded her interviews with the children "near-verbatim," the Board of Appeals review judge determined that substantial evidence supported the conclusion that Costanich directed profanity at the children, including calling E. a "bitch" and a "cunt," that she threatened to kill F., and that she told P. to "move his black ass," all of which constituted emotional abuse. While the review judge did acknowledge that Duron's investigation suffered from several errors, he declined to find her report and notes inherently unreliable.

Costanich appealed the Board's decision to the King County Superior Court, which reversed, finding that the review judge exceeded his authority by making new and inconsistent findings of fact. The Court of Appeals of Washington affirmed, reinstating the ALJ's conclusion that the finding of emotional abuse was not founded. *Costanich*, 156 P.3d at 240. The court of appeals held that "[b]ecause the review judge based his additional, contradictory factual findings solely on hearsay evidence the ALJ rejected as lacking credibility, . . . the review judge acted outside the scope [of] his authority." *Id.* at 238. It also awarded Costanich attorney's fees under Washington's Equal Access to Justice Act, Wash. Rev. Code § 4.84.350, finding that "DSHS was not substantially justified in revoking [Costanich's] license once it became aware of the problems with Duron's investigation." *Costanich*, 156 P.3d at 240.

While her appeal of the Board's decision was pending in superior court, Costanich filed a civil rights action in Washington state court, asserting claims under § 1983 and state tort law[9] against the State of Washington, DSHS, Sandy Duron,

---

[9]Costanich asserted causes of action for intentional and negligent infliction of emotional distress, negligent investigation, malicious prosecution, and abuse of process.

and DSHS officials Carol Schmidt, Beverly Payne, James Bulzomi, Robert Stutz, and Ingrid McKinney. DSHS removed the action to federal court, where it was held in abeyance pending the state court appeal. The individual defendants then moved for summary judgment, claiming absolute immunity for the investigation, the allegedly false declaration in support of guardianship termination, and the revocation of Costanich's foster care license. They also asserted qualified immunity for claims arising from their remaining actions. Costanich moved for partial summary judgment on her § 1983 claim against Duron, arguing that Duron's fabrication of evidence in her report and declaration deprived Costanich of her right to due process. The district court granted defendants' cross-motion for summary judgment on all federal claims and declined to exercise supplemental jurisdiction over the state court causes of action. Costanich and the DSHS officials timely cross-appeal.

## II. JURISDICTION AND STANDARDS OF REVIEW

The district court had original jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291.

The district court's grant of summary judgment on the ground of qualified immunity is reviewed de novo. *See Motley v. Parks*, 383 F.3d 1058, 1062 (9th Cir. 2004). "Our jurisdiction is limited to questions of law, and does not extend to qualified immunity claims involving disputed issues of material fact. Where disputed facts exist, we assume that the version of the material facts asserted by Plaintiffs, as the non-moving party, is correct." *KRL v. Estate of Moore*, 512 F.3d 1184, 1188-89 (9th Cir. 2008) (citation omitted).

The type of immunity to which a public official is entitled is a question of law, which is reviewed de novo. *See Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001). Federal law controls the question

of immunity in § 1983 cases. *Martinez v. California*, 444 U.S. 277, 284 & n.8 (1980).

A district court's determination regarding collateral estoppel is reviewed de novo. *See Littlejohn v. United States*, 321 F.3d 915, 919 (9th Cir. 2003).

We review for abuse of discretion a district court's refusal to exercise supplemental jurisdiction over state law claims after all federal claims were dismissed. *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1233 n.3 (9th Cir. 2008).

## III.  Discussion

Costanich claims that Duron and the other DSHS officials violated her Fourteenth Amendment due process rights by depriving her of liberty and property interests in her foster care license and dependency guardianship of E. and B.[10] The

---

[10]The district court correctly held that the doctrine of collateral estoppel is inapplicable because the issues considered by the state courts and the administrative agency were not identical to those presented in this federal action. In assessing the preclusive effect of state court decisions, we are required to apply the collateral estoppel principles of the state in which the decision was rendered. *See Allen v. McCurry*, 449 U.S. 90, 96 (1980) ("[T]hough the federal courts may look to the common law or to the policies supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so . . . ."); *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 (1982) ("Section 1738 requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged."). Under Washington law, "[c]ollateral estoppel, or issue preclusion, requires . . . identical issues . . . ." *City of Arlington v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 193 P.3d 1077, 1089 (Wash. 2008) (internal quotation marks omitted). The issue decided by the ALJ was whether substantial evidence supported the license revocation, while the issue decided by the state court was whether the review judge exceeded his authority in basing his factual

district court correctly concluded that Duron is not entitled to absolute immunity for the investigation and submission of the declaration in support of the guardianship termination petition, while holding that all other DSHS officials were absolutely immune from suit as to the license revocation and enjoyed qualified immunity on all remaining claims. We agree with the district court that Duron is entitled to qualified immunity for her investigation and submission of the declaration in support of the guardianship termination proceedings, but for somewhat different reasons: We conclude that deliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake,[11] and that genuine issues of material fact exist on the question of deliberate fabrication. We further conclude, however, that, because it was not clear at the time these events took place that this right applied in the context of proceedings adjudicating a foster care license and termination of guardianship, Duron did not deprive Costanich of a constitutional right that was "clearly established." Accordingly, Duron is entitled to qualified immunity for the alleged evidence fabrication and declaration in support of the guardianship termination proceedings.

findings on Duron's reports. *Costanich*, 156 P.3d at 238. By contrast, the question in Costanich's § 1983 suit is whether Duron deliberately fabricated evidence in her investigation. Even if the state court or the administrative agency addressed the truthfulness of Duron's reports, neither decided whether Duron deliberately fabricated the evidence.

[11]The Washington State Supreme Court has also recently concluded that "the deprivation of liberty based on fabricated evidence is a violation of a person's constitutional right to due process" in the criminal context, and that this principle "applies with equal force in a civil proceeding" adjudicating a pharmacist's license, reasoning that a pharmacist's professional and business licenses are property interests protected by the due process clause. *Jones v. State*, ___ P.3d ___, 2010 WL 4352199 at *5 (Wash. Nov. 4, 2010).

## A.  Absolute Immunity

**[1]**  It is well established that a defendant's immunity from a § 1983 suit is dependent on the common law immunities existing at the time of § 1983's enactment. *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976) (granting a prosecutor "the same absolute immunity under § 1983 that the prosecutor enjoys at common law"). Interpreting the Supreme Court's decision in *Kalina v. Fletcher*, 522 U.S. 118, 127-29 (1997), we recently reaffirmed that "it is only the specific function performed, and not the role or title of the official, that is the touchstone of absolute immunity." *Miller v. Gammie*, 335 F.3d 889, 897 (9th Cir. 2003) (en banc) (per curiam). Two principal functions are at issue here: (1) the institution of license revocation proceedings by Duron, McKinney, and Bulzomi, and (2) the investigation and the submission of a declaration in support of guardianship termination by Duron.

### 1.  License Revocation Proceedings

**[2]**  The district court properly concluded that Duron, McKinney, and Bulzomi were absolutely immune from suit for their involvement in Costanich's foster care license revocation proceedings. We have long held that "social workers have absolute immunity when they make 'discretionary, quasi-prosecutorial decisions to institute court dependency proceedings to take custody away from parents.' " *Beltran v. Santa Clara County*, 514 F.3d 906, 908 (9th Cir. 2008) (en banc) (quoting *Miller*, 335 F.3d at 898); *see also Meyers v. Contra Costa County Dep't of Soc. Servs.*, 812 F.2d 1154, 1157 (9th Cir. 1987). We have noted that, like a prosecutor, "[t]he social worker must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children." *Meyers*, 812 F.2d at 1157; *see also id.* ("The social worker's independence, like that of a prosecutor, would be compromised were the social worker constantly in fear that a mistake could result in a time-

consuming and financially devastating civil suit."). Thus, "the critical decision to institute proceedings to make a child a ward of the state is functionally similar to the prosecutorial institution of a criminal proceeding," and, therefore, deserves absolute immunity. *Miller*, 335 F.3d at 898. The institution of a license revocation proceeding is sufficiently analogous to a decision to institute a custody termination proceeding to deserve absolute immunity.

### 2. Investigation and Filing of Declaration in Support of Termination Proceedings

Adhering to our en banc decision in *Beltran*, the district court also correctly concluded that Duron is not entitled to absolute immunity for investigating charges against Costanich or for filing the declaration in support of the guardianship termination proceedings.

**[3]** In *Beltran*, we held that social workers are "not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute." 514 F.3d at 908. We analogized the social worker to "[a] prosecutor [who] doesn't have absolute immunity if he fabricates evidence during a preliminary investigation, before he could properly claim to be acting as an advocate, or makes false statements in a sworn affidavit in support of an application for an arrest warrant." *Id.* (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 275 (1993); *Kalina*, 522 U.S. at 129-30). "[A]s prosecutors and others investigating criminal matters have no absolute immunity for their investigatory conduct, a fortiori, social workers conducting investigations have no such immunity." *Beltran*, 514 F.3d at 908-09. Duron's argument that in filing the declaration, she acted as a witness, and therefore deserves absolute immunity under *Burns v. County of King*, 883 F.2d 819, 822-23 (9th Cir. 1989), is unpersuasive in light of *Beltran*'s clearly controlling

conclusion to the contrary. Thus, Duron is not entitled to absolute immunity from the claims that she deliberately fabricated evidence in her investigation and made false statements in the sworn declaration submitted in support of the guardianship termination proceedings.

## B.  Qualified Immunity

**[4]** In determining whether Duron is entitled to qualified immunity for the investigation and declaration, we apply the two-step the analysis set forth in *Saucier v. Katz*, 533 U.S. 194 (2001), under which we inquire, in sequence, (1) whether "the facts alleged show the [official]'s conduct violated a constitutional right," and (2) "whether the right was clearly established." *Id* at 201.[12] The district court concluded that Costanich failed to establish that her constitutional rights were violated or that any of the rights she asserted was well established. We disagree with the district court's conclusion that Costanich failed to establish that Duron violated Costanich's constitutional rights; however, we agree with the district court that no such constitutional rights were clearly established.

### 1.  *Whether Duron Violated Costanich's Constitutional Rights*

"[T]o establish a substantive due process claim a plaintiff must . . . show a government deprivation of life, liberty, or property." *Nunez v. City of Los Angeles*, 147 F.3d 867, 871

---

[12]We note that, although we are no longer required to apply *Saucier*'s two steps in turn, doing so is often appropriate and beneficial. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) ("On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."). We proceed to apply the *Saucier* two steps in sequence because we have discretion to do so, and because we find such application to be beneficial. *See id.* ("Although we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that it is often beneficial.").

(9th Cir. 1998). Therefore, before turning to the question of whether Costanich's due process rights were violated, we must first determine whether there has been a deprivation of life, liberty, or property. Costanich asserts that by deliberately fabricating evidence during the investigation and making false statements in the declaration supporting the guardianship termination proceedings, Duron deprived her of property and liberty interests in her foster care license and in the care of E. and B. as their dependency guardian. The district court found that "Defendants do not dispute that Plaintiff has property and liberty interests in her foster case license or that she has a liberty interest in the care of E. and B." On appeal, DSHS officials argue that the district court merely "assumed" the above finding, but they admit in a footnote that "Defendants did not address this issue in their summary judgment brief due to page constraints." Having failed to dispute this issue below, the DSHS officials waive the argument on appeal that Costanich lacks a liberty or property interest in her foster care license and guardianship of E. and B.

[5] As a general rule, we do "not consider an issue not passed upon below." *Dodd v. Hood River County*, 59 F.3d 852, 863 (9th Cir. 1995) (internal quotation marks and citation omitted). "It is immaterial whether the issue was not tried in the district court because it was not raised or because it was raised but conceded by the party seeking to revive it on appeal." *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978). The DSHS officials' "page constraints" argument is unpersuasive, as they filed three merits briefs on summary judgment totaling sixty pages. They certainly could have devoted space to this issue if they seriously contested it. In any case, following our decision in *Joshua v. Newell*, 871 F.2d 884, 886 (9th Cir. 1989), where we "assume[d] without deciding that the [foster parents] had a protected property interest in their license," and the Supreme Court's decision in *Smith v. Organization of Foster Families for Equality & Reform* (*OFFER*), 431 U.S. 816 (1977), which was decided "on the assumption that [foster parents] have a protected 'lib-

erty interest,' " *id.* at 847, we may proceed to consider whether Duron violated Costanich's due process rights.

**[6]** "Substantive due process protects individuals from arbitrary deprivation of their liberty by government." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006). "The Court has repeatedly 'spoken of the cognizable level of executive abuse of power as that which shocks the conscience.' " *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Costanich's claim is that Duron falsified evidence in her investigation and used that false evidence as support for her declaration, which led to the termination proceedings and the revocation of Costanich's foster care license. To sustain a deliberate fabrication of evidence claim, we have held that a plaintiff must,

> *at a minimum*, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

*Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). We noted that "mere allegations that Defendants used interviewing techniques that were in some sense improper, or that violated state regulations, without more, cannot serve as the basis for a claim under § 1983." *Id.* at 1075.

The district court concluded that, under *Devereaux*, Costanich has not demonstrated that Duron deliberately fabricated evidence. It held that Costanich failed to show that Duron or any other DSHS official continued the investigation despite knowing of Costanich's innocence or used coercive techniques that were known to produce false information. Concluding that the recognized problems with Duron's inves-

tigation were just "recording errors and misstatements," it held that "a careless or inaccurate investigation that does not ensure an error-free result does not rise to the level of a constitutional violation." (citing *Devereaux*, 263 F.3d at 1076-77); *see also Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003) ("[Inaccuracy] claims do not show [the state employee] continued the investigation despite knowing [the subject of a child abuse investigation] was innocent or that he used investigative techniques that he knew would yield false information. . . . While [the state employee's] affidavit may have been careless or inaccurate, it does not satisfy *Devereaux*'s stringent test.").

[7] The district court read the *Devereaux* standard too narrowly. Costanich alleges, and has produced evidence supporting her claim, that Duron deliberately misquoted and misrepresented witness statements, i.e., deliberately falsified statements in her investigative report and declaration. The *Devereaux* test envisions an investigator whose unlawful motivation is illustrated by her state of mind regarding the alleged perpetrator's innocence, or one who surreptitiously fabricates evidence by using coercive investigative methods. These are circumstantial methods of proving deliberate falsification. Here, Costanich argues that the record directly reflects Duron's false statements. If, under *Devereaux*, an interviewer who uses coercive interviewing techniques that are known to yield false evidence commits a constitutional violation, then an interviewer who deliberately mischaracterizes witness statements in her investigative report also commits a constitutional violation. Similarly, an investigator who purposefully reports that she has interviewed witnesses, when she has actually only attempted to make contact with them, deliberately fabricates evidence.

[8] We have previously held that when genuine issues of material fact arise regarding fabrication of evidence in a child abuse investigative report, a police officer is not entitled to qualified immunity because "[c]redibility is an issue for the

trier of fact." *McSherry v. City of Long Beach*, 560 F.3d 1125, 1130 (9th Cir. 2009). Summary judgment on this issue was inappropriate here because Costanich introduced sufficient evidence to demonstrate genuine issues of material fact. For example, Duron's report indicated that she had interviewed thirty-four people. She later admitted that she had made only brief contact with eighteen of the individuals listed. The misrepresentations about interviewing the children's doctors were especially significant. The suggestion that she interviewed three of the therapists and received reports from a fourth lent credibility to her report, but, as Duron testified at the ALJ hearing, she did not actually speak to "[m]edical professionals." In addition, the investigative report suggests that Duron interviewed K. and describes a conversation with Dr. Crabbe, the therapist whose referral was the catalyst for Duron's investigation. Upon examination by the ALJ, however, Duron admitted that during the "interview" with K. she was holding a copy of Dr. Crabbe's referral and K. only told her that "[e]verything that's on the referral is true," even though she never showed the referral to K. Further, she conceded that "K. wouldn't say much" but that she still "just kind of summarized what he was saying." Duron admitted that she never actually interviewed Dr. Crabbe, despite the fact that Dr. Crabbe made the initial referral and sent DSHS a letter on December 18, 2001, "strongly recommend[ing] that K. remain" with the Costaniches as he "has made a very positive adjustment to the Costanich home."

[9] Other witnesses pointed out that the report contained evidence or statements they never made. For example, according to Duron's report of her interview with Diane Isley, the guardian ad litem for F., Isley stated that Costanich, in reference to a child that might try to run away, said she would "chain the little shit to the bed." Isley declared in a sworn letter, however, that she never made this statement and that she never talked to Duron about such a child. Duron also reported that another aide, Crystal Hill, said that Costanich was "always calling E. a 'fucking cunt, and bitch.' " In a sworn letter,

however, Hill stated: "I have never seen her directly swear face to face at one of the children." Further, that Duron purposefully used quotation marks around many of the purported witness statements in her investigative report—including the Isley and Hill statements—could support a trier of fact's conclusion that Duron deliberately fabricated evidence. In the defamation context, the Supreme Court has said:

> [Q]uotation marks around a passage indicate to the reader that the passage reproduces the speaker's words verbatim. They inform the reader that he or she is reading the statement of the speaker, not a paraphrase or other indirect interpretation by an author. By providing this information, quotations add authority to the statement and credibility to the author's work. Quotations allow the reader to form his or her own conclusions and to assess the conclusions of the author, instead of relying entirely upon the author's characterization of her subject.

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 511 (1991) (holding that a jury may find knowledge or reckless disregard of falsity when a publication attributes to the plaintiff quoted statements that the plaintiff never actually made). Moreover, contrary to Duron's report, all of the witnesses' sworn letters express positive descriptions of the Costanich foster home. Finally, the ALJ, who had the benefit of live witness testimony, found that "a number of [the] witnesses . . . specifically dispute the reported evidence in the form of the Service Episode Reports (SERs) which Ms. Duron utilized in memorializing the information she received."

**[10]** The district court's description of the errors in the investigation as "recording errors and misstatements" is untenable in light of the principle that, on summary judgment, we must draw all factual inferences in favor of the nonmoving party. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). It is true that, despite Costanich's claims

to the contrary, Duron never admitted to falsifying the record. An admission by a defendant, however, is not required to survive summary judgment. Resolution of disputed material facts is the special province of the factfinder. *See Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999). The errors in Duron's report are not questions of tone or characterization but actual misrepresentations. In concluding otherwise, the district court relied on *Gausvik*, where a police officer stated in a probable cause affidavit that the defendant's children tested "positive" for child abuse, though the tests were only "consistent" with child abuse. 345 F.3d at 817. The substitution of "consistent" for "positive," however, reasonably may be characterized as a misstatement. Reporting that a witness said something she did not cannot be so characterized.

It is also true that, in the course of her investigation, Duron could have believed that Costanich was guilty of emotional abuse. Under Washington law, foster parents are prohibited from the use of "cruel, unusual, frightening, unsafe or humiliating discipline practices," which include "[n]ame calling, using derogatory comments; [t]hreatening the child with physical harm; [and t]hreatening or intimidating the child." Wash. Admin. Code § 388-148-0470(1)(f)-(h). At the time of Duron's investigation, Washington law defined abuse as "acts which are cruel or inhumane regardless of observable injury," Wash. Admin. Code. § 388-15-130(3)(d) (repealed), and the Court of Appeals of Washington had held that a foster mother's "use of profanity to address the children constitutes humiliating discipline," leading to the conclusion that the combined "use of corporal punishment and profanity justified the revocation of her foster care license," *Morgan v. Dep't of Soc. & Health Servs.*, 992 P.2d 1023, 1027 (Wash. Ct. App. 2000). If the only evidence of deliberate fabrication were inferences from Duron's investigative methods, under *Devereaux*, Duron's subjective and personal belief of Costanich's guilt might have explained why Duron continued the investigation. 263 F.3d at 1076. That belief, however, does not permit or excuse deliberate falsification of evidence.

For the same reasons, genuine issues of material fact also exist as to whether Duron's statements in the declaration in support of the termination proceedings violated Costanich's due process rights. In the declaration, Duron repeats substantially the same facts as recited in her report and that are contested on appeal—that she interviewed the children's therapists, that an aide said Costanich called E. a "fucking cunt, and bitch," and that a CASA, presumably Isley, said that Costanich used profanity "toward" the children. Record evidence in the form of sworn letters from these individuals creates a material dispute as to these facts and as to the deliberateness of Duron's inclusion of these facts in her declaration.

**[11]** We therefore conclude that Costanich had a Fourteenth Amendment due process right to be free from deliberately fabricated evidence in a civil child abuse proceeding, and that, because genuine issues of material fact exist as to whether Duron deliberately fabricated evidence, which led to the termination proceedings and license revocation, the district court erroneously concluded that "Plaintiff has not provided evidence showing that Defendants deliberately made false statements and fabricated evidence to make a false finding of abuse."

## 2. Whether the Right Is Clearly Established

The district court held that Costanich "failed to identify a clearly established right that Defendants violated" because her right to due process is "too nebulous to be 'clearly established.' " It reasoned that "the constitutional right 'not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government,' " based on *Devereaux*, was inapplicable here because Costanich was not subjected to criminal charges, but only to civil license revocation and guardianship termination proceedings. According to the district court, the distinction between the alleged deprivation of liberty here and the deprivation in *Dev-*

*eraux* is critical: the former involves the government's deliberate fabrication of evidence in *civil* child abuse proceedings while the latter involves the government's deliberate fabrication of evidence in *criminal* child abuse proceedings. We agree with the district court's conclusion that Duron did not violate Costanich's "clearly established" rights. Although we conclude that, going forward, officials who deliberately fabricate evidence in civil child abuse proceedings which result in the deprivation of a protected liberty or property interest are not entitled to qualified immunity, this right had not previously been clearly established in the civil context.[13]

[12] A right is "clearly established" when "the contours of the right were already delineated with sufficient clarity to make a reasonable offic[ial] in the defendant's circumstances aware that what he was doing violated the right." *Devereaux*, 263 F.3d at 1074*; see also Saucier*, 533 U.S. at 202 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."). *In Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942), the Supreme Court held that the prosecution's knowing use of perjured testimony to obtain a criminal conviction violates the Constitution. In *Devereaux*, we considered a § 1983 claim by a foster parent against police officers and DSHS officials who investigated and prosecuted the parent for criminal sexual abuse of his foster children. Relying upon *Pyle*, we held "that there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux*, 263 F.3d at 1074-75. Though we were "not aware of any prior cases that have expressly

---

[13]The Washington State Supreme Court declined to grant qualified immunity in *Jones* to the Board of Pharmacy inspectors because it was clearly established Washington law that a pharmacist has a constitutionally protected property interest in his professional and business licenses. We do not reach the question whether Costanich has a similarly protected right to her foster care license. *See* 2010 WL 4352199 at *5, 8.

recognized this specific right," we found that "the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious, and *Pyle* is sufficiently analogous, that the right to be free from such charges is a constitutional right." *Id.* at 1075; *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." (citation omitted)).

**[13]** Under *Devereaux*, charging an individual with criminal child abuse based on false information violates the Constitution. *Devereaux*, 263 F.3d at 1075. Although *Devereaux* does not specifically address civil child abuse proceedings, the right not to be accused based upon deliberately fabricated evidence is sufficiently obvious, and *Devereaux* is sufficiently analogous to the facts here, that government officials are on notice that deliberately falsifying information during civil investigations which result in the deprivation of protected liberty or property interests may subject them to § 1983 liability. As *Devereaux* stated, while "there is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out in a particular way," *id*, "intentionally fabricating false evidence is quite another" matter, *id.* at 1077. Further, because social workers, like prosecutors, are entitled to absolute immunity for instituting child removal proceedings, social workers, like prosecutors, must refrain from deliberately falsifying evidence during investigations and in sworn testimony or declarations to the court.**[14]** *See gen-*

---

**[14]**Our sister circuits have denied qualified immunity to social workers who removed children from their families based on unreliable evidence in violation of the due process right of family integrity. *See, e.g.*, *Croft v. Westmoreland County Children & Youth Servs.*, 103 F.3d 1123, 1127 (3d Cir. 1997) (denying qualified immunity to a social worker who separated a child from her parent on the basis of an uncorroborated anonymous tip

*erally Beltran*, 514 F.3d at 906. Thus, going forward, reasonable government officials are on notice that deliberately falsifying evidence in a child abuse investigation and including false evidentiary statements in a supporting declaration violates constitutional rights where it results in the deprivation of liberty or property interests, be it in a criminal or civil proceeding.

[14] However, given the distinctions between criminal prosecutions and civil foster care proceedings, we cannot say that this right was clearly established as of 2001, when the conduct at issue in this case occurred. The special duties of prosecutors and the unique interests at stake in a criminal action do not parallel the duties and interests at stake in a civil child custody proceeding. Washington's "paramount concern" for safeguarding and protecting the health and safety of foster children, for example, places a special duty on DSHS officials to vigorously investigate allegations of child abuse. *See, e.g.,* Wash. Rev. Code §§ 13.34.020, 74.13.010, 74.13.031(3). Furthermore, it is clear that Washington foster care licensees' and custodial guardians' interests do not rise to the level of a criminal defendant's interests, which are clear and long-established. While these factors do not excuse deliberate fabrication of evidence, there are sufficient distinctions between criminal prosecutions and civil foster care proceedings that

---

and without "objectively reasonable grounds"). They have also denied qualified immunity to social workers investigating child abuse who fabricated evidence to support a search warrant in violation of the Fourth Amendment. *See, e.g.*, *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990) (holding that social workers' false "sworn representations as to the existence of probable cause would be perjury . . . and perjury is not objectively reasonable conduct"). Though these cases do not specifically discuss the due process right not to be subject to child abuse allegations on the basis of deliberately falsified evidence, they nonetheless reflect the prevailing principle that social workers who deliberately falsify evidence in child abuse investigations cannot claim the benefit of qualified immunity.

the right had not yet been clearly established in the civil context.

**[15]** Because we conclude that the right not to be accused based on deliberately falsified evidence during civil investigations which could result in the deprivation of protected liberty or property interests was not clearly established when the conduct at issue in this case occurred, we affirm the district court's grant of summary judgment on the basis of qualified immunity.[15]

## C. Remaining Claims Against DSHS Officials

The district court does not specify for which acts the other DSHS officials were granted qualified immunity. Though Costanich's briefs focus principally on Duron, she also alleges that other DSHS officials, including Payne and Stutz, knew about and failed to correct the errors in Duron's investigation and relied on the investigation to go forward with the termination petition. More specifically, she claims that Payne directed another CPS employee to make a referral against Costanich, that Schmidt lied about making a CPS referral, that McKinney admitted to entering false records regarding Costanich, and that Bulzomi and Stutz threatened her with loss of her daughters if she disputed the abuse finding. These claims are not supported by the record. No evidence supports the claim that Schmidt lied about a referral. McKinney did not admit to a falsification of evidence but only to a mistake.

Several of the DSHS employee claims also do not rise to the level of a constitutional violation. Costanich does not

---

[15]And, because the issue is not properly before us, we decline to decide whether a Washington state foster parent in fact has a protected liberty interest in a foster care license. As discussed, DSHS waived the argument that Costanich does not have a protected liberty interest in her foster care license. Accordingly, we need not reach this question. *See Dodd*, 59 F.3d at 863.

explain how Payne's direction to an employee to investigate and file a referral regarding an incident involving one of the foster children, or the Bulzomi/Stutz offer, or the fact that Payne and Stutz knew of the letters by therapists who opposed removing the foster children violate Costanich's constitutional rights. Costanich points to nothing in the record that supports the conclusion that these officials deliberately fabricated evidence. Some evidence may be read to suggest that someone at DSHS was improperly motivated to terminate Costanich's guardianship of E. and B. For example, in March 2002, a new social worker, Jackie Timentwa-Wilson, replaced E.'s and B.'s previous social workers, E. Nelson and S. Hunter, after both Nelson and Hunter recommended that the girls remain with Costanich. Nelson testified that she was removed from the case for not advocating removal, and Hunter testified that she was removed from the case suddenly and told not to contact the new social worker. It is reasonable, however, that the DSHS officials believed their actions regarding the termination proceedings were justified based on Costanich's undisputed use of profanity around the children, even if they had reason to question some of the conclusions in Duron's investigation, and Costanich has adduced no evidence to the contrary. Costanich thus failed to establish a violation of a clearly established constitutional right by the other DSHS officials. Therefore, the district court correctly entered judgment in their favor on the basis of qualified immunity.

To the extent that Costanich maintains her procedural due process claims on appeal, they were properly dismissed by the district court. As the district court concluded, Costanich benefitted from multiple layers of administrative and state court review and, therefore, cannot allege that she is a victim of "lack of process." Costanich also raises on appeal a § 1983 malicious prosecution claim. Because she failed to raise this issue in the district court, she has waived this claim. *See Dodd*, 59 F.3d at 863. Finally, Costanich raises a First Amendment claim for the first time in her reply brief. She argues that the DSHS officials violated her First Amendment

rights when they threatened the loss of her daughters if she challenged their finding of abuse. She supports her claim with a citation to *Hartman v. Moore*, 547 U.S. 250 (2006), which sets forth the general proposition that the "First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Id.* at 256. Costanich waived this argument by failing to raise it at the district court, *Dodd*, 59 F.3d at 863, and in her opening brief on appeal, *Martinez-Serrano*, 94 F.3d at 1259.

## IV. CONCLUSION

We affirm the district court's judgment in favor of Duron, McKinney, and Bulzomi on the basis of absolute immunity for the revocation of Costanich's foster care license. We also affirm the judgment in favor of Schmidt, Payne, Bulzomi, Stutz, and McKinney on qualified immunity grounds for various actions taken by them with regard to Costanich. Finally, we affirm the judgment in favor of Duron on qualified immunity grounds for her investigation and the declaration in support of the guardian termination proceedings because, although genuine issues of material fact exist as to whether Duron deliberately fabricated evidence, Duron did not deprive Costanich of a clearly established constitutional right.

**AFFIRMED.**