Clyde Ray SPENCER, Plaintiff,

v.

James M. PETERS, et al., Defendants.

Case No. C11–5424 BHS.

United States District Court,
W.D. Washington,
at Tacoma.

Aug. 21, 2013.

Order Denying Reconsideration
in Part Sept. 17, 2013.

Subsequent Determination Oct. 2, 2013.

Douglas H. Johnson, Kathleen T. Zellner, Kathleen T. Zellner & Associates, Downers Grove, IL, Daniel Davies, Davis Wright Tremaine, Seattle, WA, for Plaintiff.

Daniel J. Judge, Olympia, WA, Patricia Campbell Fetterly, Attorney General's Office, Olympia, WA, Guy Bogdanovich, Law Lyman Daniel Kamerrer & Bogdanovich, Olympia, WA, Jeffrey A.O. Freimund, Freimund Jackson Tardiff & Benedict Garrett, Olympia, WA, for Defendants.

ORDER GRANTING IN PART AND DENYING IN PART KRAUSE'S MOTION FOR SUMMARY JUDGMENT

BENJAMIN H. SETTLE, District Judge.

This matter comes before the Court on Defendant Sharon Krause's ("Krause") second motion for summary judgment (Dkt. 139). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants in part and denies in part the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

On June 2, 2012, Plaintiffs Clyde Ray Spencer ("Mr. Spencer") and his two children, Matthew Ray Spencer ("Matthew") and Kathryn E. Tetz ("Kathryn"), filed a complaint against Krause, a former detective for the Clark County Sheriff's Office ("Sheriff's Office") and five other named Defendants, including John and Jane Does 1 through 10. Dkt. 1.

The lawsuit alleges state tort claims and violations of federal civil rights. Dkt. 1 at 45–67. Mr. Spencer alleges seven causes of action under 42 U.S.C. § 1983 ("§ 1983"), plus four state law claims. *Id.* at 45–65. His federal claims are for malicious prosecution, deprivation of due process, "destruction or concealment of exculpatory evidence," conspiracy, "failure to intervene, false arrest, and false imprisonment" and conspiracy. *Id.* at 45–58, 289–349. His state law claims are for malicious prosecution, intentional infliction of emotional distress ("IIED"), conspiracy, and defamation. *Id.* at 59–65, 350–82. These federal and state claims are alleged against all Defendants except Shirley Spencer, who is a named Defendant only as to Mr. Spencer's § 1983 conspiracy claim and his state law claims for IIED and conspiracy. *See id.* Kathryn and Matthew allege state law claims for loss of consortium. *Id.* at 66–67, 383–9. Their claims are alleged against all Defendants, except Ms. Spencer. *Id.*

On May 23, 2012, Krause filed a motion for summary judgment. Dkt. 65. On June 18, 2012, Plaintiffs filed a response to Krause's motion and requested a continuance. Dkt. 72. On June 22, 2012, Krause

filed a reply. Dkt. 83. On July 2, 2012, Plaintiffs filed a surreply. Dkt. 87.

On October 16, 2012, 2012 WL 4903255, the Court issued an order granting in part and denying in part Krause's motion for summary judgment and Spencer's motion to continue. Dkt. 93. In that order, the Court dismissed all state law claims against Krause, permitted Spencer to pursue further discovery on all § 1983 claims, consistent with the findings the Court had made, and denied without prejudice Krause's request for summary judgment based on qualified immunity. *See id.* at 27–28.

On January 16, 2013, Krause filed the instant motion for summary judgment. Dkt. 139. On March 21, 2013, Spencer filed a response in opposition to Krause's motion. Dkt. 166. On April 12, 2013, Krause filed a reply brief.[1] Dkt. 171.

## II. FACTUAL BACKGROUND

As multiple Court orders reflect, this case has a rather extensive background involving allegations that take place over the span of almost thirty years. In 1985, by way of an *Alford* plea, Mr. Spencer was convicted of multiple counts of sexually abusing his children Matthew, then age nine, and Kathryn, then age six, and his step-son Matthew Hansen ("Hansen"), then age five, and sentenced to life in prison. Dkt. 1 at 6; 63–8; & 63–9. Subsequently, Mr. Spencer filed numerous petitions with the state and federal courts challenging his arrest, conviction, and incarceration.

### A. Initial Allegations

Mr. Spencer is a former police officer of the Vancouver Police Department ("VPD"). Dkt. 63–3 at 2. In the summer of 1984, while he was employed by the VPD, Mr. Spencer and his now former wife, Shirley Spencer ("Shirley"), and Hansen were visited by Kathryn and Matthew, children from his prior marriage to DeAnne Spencer ("DeAnne"). Dkt. 1 at 6–7. Upon Mr. Spencer's return from a seminar, Shirley advised him that Kathryn made inconsistent allegations of sexual abuse, including ones against him. *Id.* at 7 & 63 at 2. The allegations were reported to Child Protective Services ("CPS") in Vancouver, Washington and to CPS in Sacramento, California, where the children resided with their biological mother, DeAnne. *Id.*

On August 29, 1984, Detective P. Flood ("Flood") of the Sacramento County Sheriff's Department, due to a referral from Sacramento CPS regarding allegations of abuse by Kathryn Spencer, made contact by phone with Mr. Spencer and Shirley. Dkt. 158 at 5–9. In his report, Flood records telephonic interviews with Mr. Spencer and Shirley. *Id.* In part, Flood indicates that Shirley reported to him that Kathyrn had disclosed allegations of sexual abuse by her father, including, for example, that "daddy wanted me to rub his pee pee and he rubbed [mine]" and that "she sat on her father's lap with her father's penis between her legs." *Id.* at 9. Shirley also told Flood that Kathryn reported that "[s]he put it in her mouth and he tried to put his penis into her pee pee but it hurt." *Id.* Additionally, Shirley reported that Kathryn told her about her "daddy kissing her on her pee pee" and that it happened "lots of times." *Id.* Shirley also told Flood that Kathryn had made allegations against her mother DeAnne, including that "her mom wanted her to rub her titties and pee

---

1. To avoid recitation of the entire procedural history terminating Defendants from this case, in summary fashion, the Court notes the only Defendants remaining in this action are Krause and Michael Davidson.

pee." *Id.* According to Flood's report, Shirley told him that Kathryn had made these allegations while they were lying on the floor watching television and Kathryn "kept moving my bathrobe ... to expose my breasts and one time she put her hand too far down toward the vaginal area," which Shirley told Kathryn was unacceptable. *Id.* Then, Kathryn said to Shirley " 'rub my pee pee' " because it " 'fe[els] good.' " *Id.* Flood's report indicates that he told Shirley and Mr. Spencer to contact their local law enforcement so that they could both be interviewed by those authorities. *Id.* at 10.

On that same day, Flood interviewed Kathryn, Matthew and DeAnne in person. *Id.* at 11–14. Flood's report indicates that Kathryn stated, among other things, that DeAnne only touches her "potty" when she is putting medicine on it. *Id.* at 11. Flood also indicates Kathryn reported that "she did tell Shirley everything that Shirley advised me of but then when asked to explain it or asked specific questions about it, [Kathryn] would say that she couldn't remember the words so she couldn't tell me." *Id.* Flood's report also states that he asked Kathryn "if someone told her not to tell about it and she indicated by shaking her head yes." *Id.* He further states that "[w]hen asked if someone had touched her pee pee she shook her head yes and when asked who, she would say daddy and then a few moments later she said not daddy, no one." *Id.* Finally, Flood's report states that Kathryn indicated that "her and her father played a game but she didn't want to talk about the game." *Id.*

Unlike Kathryn, Matthew indicated to Flood that he knew nothing about Kathryn's alleged abuse and denied his father or mother touched him inappropriately. *Id.* at 12. Among other information, Flood's report states that Matthew indicat-ed that his sister told stories and changed her stories. *Id.*

When interviewing DeAnne, Flood's report indicates in part that she knew nothing of these allegations. *Id.* at 13. She denied inappropriately touching Kathryn. *Id.* at 14. DeAnne also indicated that her sister told her that she worried about Kathryn and Ray, stating to DeAnne that "something was not right but she couldn't elaborate what." *Id.* at 13. Flood's report also notes that DeAnne told him that she had not had a man stay in the house for a long time, and there had been a "man that was there and bothered the children so [she] would not let a man stay in the house any longer." *Id.* DeAnne indicated that she never left the children alone with a man. *Id.*

**B. Additional Investigation, Initial Charges & Arrest**

On August 30, 1984, Officer R. Stephenson ("Officer Stephenson") of the Clark County Sheriff's Office was dispatched to contact Mr. Spencer regarding Kathryn's allegations of child abuse. Dkt. 64–1. Officer Stephenson went to Mr. Spencer's home in Washington. *Id.* at 2. At that time, Shirley provided a six-page handwritten statement detailing the allegations that Kathryn relayed to her on August 24, 1984. Among the many details, Shirley writes that Kathryn wanted her to "rub her pee pee" which Kathryn said "felt good." *Id.* at 4–5. Shirley records that Kathryn told her she did this with her mother and Karen Stone, a former girlfriend of her father. *Id.* at 5–6. According to Shirley's statement, Kathryn described oral sex with her father and stated that he placed his penis between her legs and tried to insert it "in her little hole" but stopped when they realized "it was too big." *Id.* at 8–9. Shirley also stated that

Kathryn told her that her father told her "not to tell." *Id.* at 8.

After Shirley's report was referred to Sacramento, California CPS and law enforcement cleared DeAnne of sex abuse allegations, the investigation was referred back to Clark County, Washington. Dkt. 138–10 at 25. In October 1984, Krause, a detective was assigned to investigate the Spencer case. *Id.* at 6. Defendant Michael Davidson ("Davidson"), also a detective with the Clark County Sheriff's Office, was Krause's supervisor and the sergeant of the unit. *Id.*

On October 16, 1984, five-year-old Kathryn was interviewed by Krause, who made a written report of Kathryn's allegations of sexual abuse by her father. Dkt. 138–11 & 12 at 1–5. In Krause's report of her interview with Kathryn, in which she used anatomically correct dolls, Kathryn described an incident very similar to what Shirley described Kathryn had engaged in on the night that Kathryn made the alleged disclosures to Shirley. *See id.* Krause records that Kathryn described how she touched Shirley on the breasts and stated the "pee pee got touched too," indicating that she touched Shirley's genitals. *Id.* at 33. According to Krause, Kathryn said Shirley indicated she didn't like it. *Id.* Krause also records that Kathryn said this happened when she told Shirley about "a secret about my daddy's wiener." *Id.* Among other details, Krause's report further states that Kathryn indicated that her father placed his penis in her mouth and engaged in oral sex with her. Dkt. 138–12 at 1. In Krause's report, she also indicates Kathryn stated that her father told her not to tell anybody, and she said she lied to Shirley about anyone else touching her. *Id.* at 3.

On October 18, 1984, Krause also interviewed DeAnne. Dkt. 138–12. In Krause's interview report, she states, among other information, that DeAnne described sexualized behaviors in which Kathryn engaged after returning from visits with her father in 1983 and 1984, including, for example, masturbation, touching her brother Matthew's penis in the bathtub, playing under the covers naked with her cousin Danny. *Id.* at 10–12. According to Krause's report, DeAnne also related that "during the meeting with Detective Flood and also with Katie's[2] therapist, Katie apparently was not indicating anymore than there had been something sexual between her and her father." *Id.* at 8.

On the same day, October 18, 1984, Krause interviewed Kathryn a second time. Dkt. 138–12 at 28–39. In addition to some of the same disclosures referenced in the above paragraph, Krause reports that Kathryn, using both anatomically correct dolls as well as verbal language, told Krause that her father "tried to sick his big wiener in my pee-pee, but he did that once;" that "I would have to kiss his wiener;" he "makes me touch his pee-pee;" and kisses her vagina. *Id.* at 36.

Arthur Curtis ("Curtis"), the then-elected Clark County Prosecutor (Dkt. 138–4 at 3), assigned James M. Peters ("Peters") as the prosecutor in the Spencer case. *Id.* at 7. In late November 1984, the Clark County Prosecutor's office sent the Spencer file for review to King County Prosecutor, Rebecca Roe ("Roe"). Dkt. 137 at 3 (January 15, 2013 Roe Declaration). The purpose of Roe's review was to provide an opinion concerning whether criminal charges of child rape should be filed against Mr. Spencer. *Id.* at 4. The Spencer file was sent to King County for review in part because Mr. Spencer was then employed as a police officer with the Vancouver,

---

**2.** DeAnne is referring to Kathryn as "Katie."

Washington Police Department, which is located in Clark County. *Id.*

The file Roe reviewed contained the reports by Sacramento law enforcement officers and the Clark County Sheriff's Office reports concerning allegations of sexual abuse made by Kathryn to Shirley. *Id.* at 3. Also included in the file were narrative reports prepared by Krause, which documented her interviews with Kathryn on October 16 and 18, 1984, as well as the August 30, 1984 report which included the narrative written by Shirley after Kathryn disclosed the allegations of abuse to her. *Id.* at 3–4. On November 27, 1984, Roe concluded that the case was not "filable" due to problems with what Kathryn had said, may not be willing to say, or may not be competent to testify to at trial. *Id.* For example, inconsistencies in Kathryn's statements, her reluctance to talk about abuse, and Kathryn's statements about rubbing Shirley in combination with other statements created questions of "fact v. fantasy," which Roe indicated was "built in reasonable doubt," all factored into Roe's recommendation. *Id.* at 1–3. While Roe opined that the case was "unwinnable," she also stated "I believe the child was clearly abused and probably by the defendant...." *Id.* at 3.

On December 11, 1984, Peters interviewed Kathryn. Dkt. 138–17 (Videotape Transcript). The interview was videotaped. *Id.* & 96 (DVD of Interview). Peters has testified that this interview was performed at the direction of Curtis in Peters's function as a deputy prosecutor whose role "was to determine and relay back to the prosecuting attorney impressions as to whether she might be found competent should charges be brought" and whether she could relate the allegations back to him. Dkt. 138–6 at 4, 6 and 8. Although Curtis did not explicitly state that he directed Peters to interview Ka-

thryn, Curtis was Peters's supervisor and in Curtis's deposition he did state "we definitely weren't going to make a filing decision until [Peters] had interviewed the child." Dkt. 138–4 at 17. Additionally, regarding Peters's interview of Kathryn, Curtis was asked and answered the following in deposition:

Q: ... Was the purpose of that interview to assist in making the decision whether or not to file charges?

A: Yes, because although we certainly respected what Ms. Roe had to say, she did not actually interview Katie in coming to a conclusion. She only reviewed the police report. So we felt it would be very important for Mr. Peters to actually interview her, see whether he agreed with Ms. Roe's assessment or whether he thought the case was prosecutable.

Dkt. 138–5 at 3–4. While Curtis does not recall viewing the video before filing charges, he relied in part on Peters's evaluation of Kathryn in making his charging decision. Dkt. 168–11 at 11.

During Peters's interview with Kathryn, DeAnne was present throughout. Dkts. 137–17 at 1–34. DeAnne maintains that in her presence there was "no discussion about what Katie was to say" during the sixty-six minute break in the interview, which is not recorded, and there is no indication that Kathryn was ever out of DeAnne's presence during the break. Dkt. 168–13 at 50. The interview itself reveals that the information about Spencer's alleged sexual conduct with Kathryn, which the child communicated largely through non-verbal means (e.g. nodding of the head and demonstration of events through the use of anatomically correct dolls) was cumulative of and consistent with what Krause and Shirley had already reported as Kathryn having alleged. *See* Dkt. 96 and 138–17.

Although Peters had "serious reservations" about filing charges against Spencer, Curtis has testified that it was "my call," and stated that "I felt like it was going to be a tough case and the buck ultimately stopped with me as the elected prosecutor, and I was willing to sign the information knowing that fact." Dkt. 138–5 at 1. When asked during his deposition why he filed the charges against Spencer, despite some of the problems with proof in the case, Curtis stated:

Well, I knew that it was a tough case. At the time I knew that Mr. Peters had some reservations about filing it, even after his interview with Katie Spencer. Obviously, Becky Roe had reservations, as well. . . . The thing that kept coming back to me was the part of her letter, Rebecca Roe's letter to us on page 3 where she says here: There are several problems. Although I believe [the] child was clearly abused and probably by the defendant, the case is unwinnable even assuming you can get the child to . . . talk.

I did not come to the decision to file this case lightly. I felt like there were some problems with the case, but it was my policy as the elected prosecutor to take an aggressive stand in my county towards child abusers. And the fact that Becky Roe concluded the child was abused, allegations were against this specific defendant, I decided that that's what juries are for. . . .

That's the posture I had on many of these sex abuse cases in Clark County over the years. . . . . [I]f we could win or get convictions on these types of cases even 50 percent of the time, we were doing a service to the criminal justice system and our community.

Dkt. 138–4 at 39–40. Upon review of and reliance on all the police reports and alle-gations contained therein, his conversation with Krause as to her assessment of Kathyrn, Peters's assessment of Kathryn, and potentially the report of Roe itself or at least Peters's representation thereof, Curtis made his decision to charge Mr. Spencer. Dkt. 168–11 at 11 and 14. On January 2, 1985, Curtis charged Mr. Spencer with two counts of sexually abusing Kathryn; he was arrested and then released on his personal recognizance. Dkt. 138–5 at 29.

After Curtis filed the initial charges against Mr. Spencer, the record reflects that on January 9, 1985, Curtis sent a letter to the chief of police asking that a special prosecutor from King County be assigned the case, as he mistakenly thought that Mr. Spencer was still employed by VPD. Dkt. 138–4 at 31. Barbara Linde ("Linde"), a prosecutor from King County was assigned to the case, and the King County Prosecutor's Office was involved in the case until around April 4, 1985. *See* Dkt. 138–4 at 5–7 & 138–5 at 22 and 26. However, Peters intermittently continued to be involved in the case as it developed until the Clark County Prosecutor's Office reassumed full responsibility for the prosecution in late April or early May 1985. *See, e.g.,* Dkt. 138–5 at 26–27.

**C. Additional Facts, Allegations, Further Charges & Plea**

On February 3, 1985, Clark County deputies responded to a domestic disturbance at the Spencer residence; Krause was informed of this by Deputy Don Kerr. Dkt. 172 at 18–19. The uncontroverted record indicates that, after this disturbance, Spencer moved out of his residence with Shirley, and Krause was informed of this information by Detective Hulse of the VPD. *Id.* at 19. In Mr. Spencer's complaint he indicates that after the abuse allegations surfaced, he was separated

from his wife and moved into the Salmon Creek Motel. Dkt. 1 at 17. This is consistent with the information provided to Krause by Detective Hulse. Dkt. 172 at 20.

On or about February 16, 1985, Shirley took four-year-old Hansen to the Salmon Creek Motel to stay the night with Mr. Spencer. Dkt. 1 at 17 & 64-3 at 9. On February 20, 2013, Krause, at home ill, was phoned by the Sheriff's Office Communications Center that Clark County deputies again responded to a civil disturbance at the Spencer residence regarding a dispute over guns that Mr. Spencer, who was at the house for a birthday celebration, found missing from the gun case, then demanded them from Shirley, who refused to give them to him. Dkt. 172 at 19. Mr. Spencer himself called the Sheriff's Office and requested they be on standby. *Id.* The uncontroverted evidence indicates that Krause spoke with Detective Hulse regarding Spencer's release agreement, which confirmed that he had agreed he was to have no weapons. *Id.*

The uncontroverted evidence in the record further indicates that, on February 21, 1985, Krause attempted to make phone contact with Shirley at home, and she found out from the phone company that Shirley's phone was out of order. *Id.* at 20. On the same day, the uncontroverted evidence also indicates that Krause asked the Sheriff's Office patrol unit to make a welfare check on Shirley and her family at the Spencer's Lucia Falls Road residence. *Id.* at 20. Krause was advised by dispatch that Shirley had left for work and the phone was apparently off the hook. *Id.* Based on that information, Krause phoned Shirley at work, and Shirley returned her call at 4:30 that same day. *Id.*

In Krause's February 22, 1985 report of her February 21, 1985 phone conversation with Shirley, she writes that she told Shir-

ley a number of things. Dkt. 172 at 20-25. During their conversation, Krause indicates that her motivation in sending out officers to do a welfare check was because Krause did not know "what Ray Spencer's state of mind was and also because of the information I had obtained regarding the two disturbances." *Id.* at 20. Krause's report also indicates that she was also contacting Shirley because she "had not had the opportunity to talk with her since [she] returned from Sacramento," where she had interviewed Kathryn, Matthew and DeAnne. *Id.* According to the report, Krause made arrangements to meet with Shirley the next day, February 22, 1985, to discuss the status of her investigation. *Id.* at 20-21.

According to Krause's February 22, 1985 report, she met with Shirley on that day. Dkt. 172 at 21-25. In part, Krause's report records that "several times during our conversation Shirley Spencer expressed concerns about her son, [Hansen], and how all of this was affecting him." *Id.* at 22. Krause records that she told Shirley she would talk with Hansen. *Id.* at 25. The report indicates that "Shirley Spencer advised me that she would talk with her therapist and get back to me regarding my interviewing [Hansen]." *Id.* Additionally, Krause's report indicates that Shirley said she would consider having Krause interview Hansen, and Krause said she would contact Shirley during the "first part of next week." *Id.*

On February 26, 1985, the Tuesday of the following week, Krause contacted Shirley by phone. Dkt. 168-12 at 5. Based on that phone conversation and two follow-up interviews (on February 27 and 28, 1985), one with Shirley and one with Hansen, Krause drafted an approximately 22-page report purporting to reflect what Shirley and Hansen reported regarding Spencer's

abuse of Hansen, Kathryn and Matthew. Dkt. 168–12 at 4–25 and 64–3.

In her February 28, 1985 report, Krause indicates that during their conversation on February 22, 1985, Shirley indicated that "there had been a couple of occasions when she briefly asked her son, [Hansen about Spencer inappropriately touching him], and that [Hansen] was not indicating that anything has ever occurred sexually between he [sic] and Ray Spencer." Dkt. 168–12 at 5. However, during Krause's follow-up phone call to Shirley on February 26, 1985, she thought that "Ray might have done something to [Hansen]." *Id.* Among other information, Krause's report also indicates that Shirley advised her that Hansen said "daddy had done something but it was too gross and he didn't want to talk about it." *Id.* at 6.

On February 27, 1985, Krause interviewed Shirley in person. Dkt. 168–12. In her report, Krause writes that Shirley told Krause that Hansen has disclosed to her that Spencer has physically or sexually abused him on a number of occasions, including at the Salmon Creek Motel. *Id.* at 10–12. The allegations Shirley told Krause that Hansen had disclosed involved what appear to be descriptions of oral sex and anal penetration. *Id.* at 10–11. Krause concludes her interview of Shirley with the notation that she has arranged for Shirley to take Hansen to the Sheriff's Office the following morning for an interview. *Id.* at 17.

On February 28, 1985, Krause interviewed Hansen. Dkt. 1 at 17 & 64–3. In her report, Krause indicated that Hansen alleged Mr. Spencer had committed multiple acts of violent sexual abuse at home and at the Salmon Creek Motel; Hansen also indicated that he witnessed abuse of Kathryn and Matthew and that they were forced to touch each other. Dkt. 1 at 17 & 64–3 at 16–22. On the same day of Han-

sen's interview, the Clark County Prosecutor's Office, through Peters, filed an amended information charging Mr. Spencer with three counts of statutory rape of Hansen. Dkt. 63–6. Later that day, Mr. Spencer was arrested pursuant to a warrant. Dkt. 63–4 & 5. Davidson was one of the arresting officers. Dkt. 1 at 18 & 62 at 5. Although it is disputed as to what the nature of their relationship was and when it began, Davidson and Ms. Spencer became involved, and Krause became aware of his involvement with Ms. Spencer. *See, e.g.,* Dkt. 1 at 21, 48 at 3–4, 53 at 4, 63–20 at 13, & 73–1 at 11–14.

On March 25, 1985, Krause interviewed nine-year-old Matthew. Dkt. 64–5. According to Krause's report, after Matthew denied several times that his father abused him, he told Krause that Mr. Spencer abused him, Kathryn, and Hansen and made them touch each other. *Id.* According to another interview report by Krause, that same day, she re-interviewed Kathryn, who corroborated Matthew and Hansen's statements. Dkt. 64–6. The Clark County Prosecutor's Office, through Peters, filed a second amended information, charging Mr. Spencer with ten counts of first degree statutory rape and six counts of complicity to first degree statutory rape based on the disclosures of all three children. Dkt. 63–6. On May 16, 1985, Mr. Spencer entered an *Alford* plea of guilty to multiple counts of sexually abusing Matthew, Kathryn and Hansen. Dkt. 1 at 6 & 63–7.

### D. Mr. Spencer Challenges his Arrest, Conviction and Incarceration

During his incarceration, Mr. Spencer filed numerous Personal Restraint Petitions ("PRPs") and appeals therefrom. His challenges involved alleged failures to disclose exculpatory evidence, such as Roe's opinion regarding whether to pro-

ceed with the case, and the medical reports of Kathryn and Matthew which did not corroborate the type of abuse alleged, as well as other claims, such as allegations that Davidson coerced him into pleading. Dkt. 63–11–16 & 21–25.

After several unsuccessful appeals, the relevant facts of which will be discussed throughout this order, Mr. Spencer's prison sentence was commuted to community supervision in 2004 by then Governor Locke. Dkt. 63–18. Following his release from prison, Kathryn and Matthew recanted their prior allegations of sexual abuse by Mr. Spencer. Dkt. 63–20. Hansen has not recanted his allegations of sexual abuse by Mr. Spencer. *See* Dkt. 54 & 54–1.

In 2009, the state court of appeals ruled Mr. Spencer could withdraw his *Alford* plea of guilty based, in part, on two of the three victims' recantations, and vacated his convictions. *See* Dkt. 63–20 & 22. The Washington State Supreme Court denied the state's motion for discretionary review of the court of appeals 2009 decision. Dkt. 63–24. In September 2010, the Superior Court of Washington for Clark County granted the Clark County Prosecutor's motion to dismiss the charges against Mr. Spencer without prejudice. Dkt. 63–26.

## III. DISCUSSION

Krause argues that all remaining claims against her should be dismissed. *See* Dkt. 139. She maintains there is no evidence of conspiracy. Dkt. 139 at 5–7. Krause also argues that she is entitled to qualified immunity based on the existence of probable cause and thus dismissal of claims for malicious prosecution, false arrest and false imprisonment. Dkt. 139 at 7–10. She further argues that she is entitled to qualified immunity because there is no genuine issue of material fact as to whether she coerced or otherwise fabricated the

victims' abuse allegations or other evidence. *Id.* at 10–19. Additionally, she argues that she is entitled to qualified immunity for the alleged failure to disclose evidence. *Id.* at 19–23. Finally, Krause argues that there is no genuine issue of material fact that she proximately caused damages to Mr. Spencer. *Id.* at 23–24.

Mr. Spencer maintains that he has elicited evidence of a conspiracy to imprison him, and Krause was involved. Dkt. 166 at 2–7. He also argues that Krause is not entitled to qualified immunity based on probable cause because she did not rely on reasonably trustworthy information, she coerced statements regarding abuse from the children or she otherwise fabricated evidence of the abuse, and she knowingly withheld relevant evidence or supplied false information to Curtis. *Id.* at 7–20. Spencer further maintains that Krause is not entitled to qualified immunity based on the fabrication of evidence for similar reasons she argues that Krause is not entitled to immunity based on probable cause. *Id.* at 17–20. Additionally, Mr. Spencer maintains that Krause is not entitled to qualified immunity for the failure to disclose evidence. *Id.* at 20–23. Finally, Mr. Spencer argues Krause proximately caused his injury. *Id.* at 23.

### A. Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

## B. Qualified Immunity

■ To determine whether a defendant is entitled to qualified immunity from § 1983 claims is a two-step inquiry. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir.2001). A Court must determine whether (1) a federal constitutional right has been violated, and (2) even if a violation occurred, whether the right was clearly established at the time of the challenged conduct sufficient to make a reasonable officer aware that he was violating the right. *Id.*

The Court begins its discussion of qualified immunity with an analysis of whether the evidence demonstrates that a genuine issue of material fact exists that Krause coerced the children into accusing Mr. Spencer of abuse or otherwise fabricated evidence against him regarding the abuse. The Court starts its analysis here because if genuine issues of material fact exist as to the aforementioned issues, then more likely than not there will be genuine issues of material fact related to Mr. Spencer's claims that probable cause did not exist, Krause was involved in the alleged conspiracy to imprison Mr. Spencer, and she was a proximate cause of Mr. Spencer's injuries.

### 1. Alleged Fabrication of Evidence

■ "[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux*, 263 F.3d at 1074–75. To the extent that a plaintiff raises a deliberate-fabrication-of-evidence claim, a plaintiff

must, at a minimum, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of [the plaintiff] despite the fact that they knew or should have known that he was inno-

cent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

*Devereaux*, 263 F.3d at 1076. Evidence of deliberate misquotation and misrepresentation of witness statements "are circumstantial methods of proving deliberate fabrication." *Costanich v. Dep't of Social and Health Services*, 627 F.3d 1101, 1111 (9th Cir.2010).

Krause argues she is entitled to qualified immunity because Mr. Spencer has not demonstrated any genuine issue of material fact exists to show that Krause acted alone or in concert with other defendants to violate Spencer's constitutional rights by using coercive interview techniques when interviewing Kathryn, Matthew and Hansen or by deliberately fabricating statements and other evidence against Mr. Spencer. *See, e.g.*, Dkt. 139 at 3.

Mr. Spencer argues that there are factual issues about what, if anything, Kathryn told Krause or her mother regarding the alleged abuse (*see., e.g.*, Dkt. 166 at 8 and 19); whether Krause deliberately fabricated Hansen's allegations of abuse (*Id.* at 13–15); whether Krause coerced, deliberately fabricated or misrepresented some or all of the alleged statements Matthew made about abuse by Mr. Spencer (*Id.* at 15–17 and 19). Additionally, Spencer claims that Krause recorded a "false" score on Mr. Spencer's polygraph test, thus fabricating further evidence against him. *Id.* at 17. Mr. Spencer also maintains throughout that Krause knew or should have known that he was innocent but continued her investigation. *See* Dkt. 166.

## 2. Coercive Interview Techniques

Mr. Spencer makes two types of deliberate fabrication of evidence claims: (1) that Krause deliberately, grossly misquoted or misrepresented statements of abuse by the alleged victims; and (2) that Krause used coercive interview techniques to manipulate the alleged child victims into making false allegations of abuse against Mr. Spencer. *See* Dkt. 166 at 13–19.

As to Mr. Spencer's claims that Krause used coercive interview techniques such that she knew or should have known they would yield false information, as a matter of law, the Court must find that Krause is entitled to qualified immunity for those claims. Even though the Court may find improper some of Krause's methods used during interviews of the three children, Mr. Spencer fails to cite any case demonstrating that in 1984 and 1985 a reasonable officer knew or should have known that, for example, suggestive, leading or aggressive questioning of a child victim would yield false information. Consistent with *Devereaux*, the Court finds in 1984 and 1985, and now, "there is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out in a particular way." *Devereaux*, 263 F.3d at 1075. In 1984 and 1985, Krause, like other "[i]nterviewers of child witnesses of suspected sexual abuse must be given some latitude in determining when to credit witnesses' denials and when to discount them, and we are not aware of any federal law-constitutional, decisional, or statutory-that indicates precisely where the line must be drawn." *Id.* Through citation to recent Ninth Circuit case law, Krause has further demonstrated an absence of a genuine issue of material fact as to whether she is entitled to qualified immunity for the alleged use of coercive interview techniques, because, as Krause observes, in analyzing qualified immunity:

we ask whether [the constitutional right to have a witness interviewed in a particular way had] contours [which] were sufficiently clear that every reasonable official would have understood that what he is doing violates that right. (citations omitted). While we do not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate. Dkt. 171 at 2 (*citing Mattos v. Agarano,* 661 F.3d 433, 442–42 (9th Cir.2011) (citations omitted)). Mr. Spencer has cited no such precedent that would have placed Krause on notice that her interview techniques were so coercive and abusive that she knew or should have known they would yield false evidence thus putting them beyond constitutional debate.

### 3. Deliberate Misquotation or Misrepresentation

 As noted above, Mr. Spencer also claims that Krause deliberately fabricated evidence by misquoting or misrepresenting what the alleged child victims said to her. *See infra.* Evidence of deliberate misquotation and misrepresentation of witness statements "are circumstantial methods of proving deliberate fabrication." *Costanich v. Dep't of Social and Health Services,* 627 F.3d at 1111. Under Costanich, while "questions of tone or characterization" of witness statements or simple "misstatements" in an investigator's report are not evidence of deliberate fabrication, "actual misrepresentations" or "[r]eporting that a witness said something she did not cannot be . . . characterized as a 'misstatement.' " *Costanich,* 627 F.3d at 1113. In analyzing the facts of *Costanich,* where witnesses disputed that they made statements the investigator attributed to them through the use of quotation marks, the Ninth Circuit found that purposeful use of quotation marks around purported witness statements in an investigative report could

support a trier of fact's conclusion that the investigator deliberately fabricated evidence. *Costanich,* 627 F.3d at 1112. Such actions may illustrate "an investigator whose unlawful motivation is illustrated by her state of mind regarding the alleged perpetrator's innocence. . . ." *Costanich,* 627 F.3d at 1111. Thus, evidence of deliberate misquotation and actual misrepresentations can demonstrate the "Defendants continued their investigation of [the Plaintiff] despite the fact that they knew or should have known that he was innocent." *Devereaux,* 263 F.3d at 1076 (when plaintiff raises a deliberate-fabrication-of-evidence claim, a plaintiff must, at a minimum, point to evidence that supports at least one of the following two propositions, only one of which is at issue here: whether the officer knew or should have known the plaintiff was innocent but continued the investigation anyway).

#### a. Kathryn

 When asked to review the six-page statement made by Shirley Spencer indicating that on August 24, 1984, while they were lying on the living room floor, Kathryn told her that she had been sexually abused by her father, Kathryn testified she had no recollection of making those allegations to her step-mother, and she stated "I did not say those things to her. These are Shirley's words." Dkt. 168–6 at 20 (November 14, 2012 Dep. of Kathryn (Spencer) Tetz). Kathryn also testified that she has no memory of speaking with Flood or James Rulli, his father's attorney. *Id.* In her deposition, Kathryn further stated that she would "have no knowledge of what these sexual acts are, so to be able to describe them to [Shirley] isn't even something I would have done." *Id.* at 21–22. Then, Kathryn goes on to testify that "I know I didn't say these things to [Shirley]. I know myself and I know the vocab-

ulary I was capable of at this time and I did not say these things to her." *Id.* Although Kathryn admits that Shirley asked if Spencer had touched her inappropriately, she maintains that occurred while they were in the laundry room in the house by the river, not "laying on the floor in the living room" as all the reports indicate. *Id.* at 23. However, Kathryn also testified "I don't remember how I responded [to Shirley]," and she indicated that "I somehow answered whatever it was that I answered to her." *Id.*

In addition, Kathryn denies having been abused, or at least that she doesn't remember the abuse occurring. In her November 14, 2012 deposition, she testified that she "knew her whole life that [the abuse] had not happened." Dkt. 168–6 at 3. Later in reviewing her former testimony under oath, Kathryn agrees that her testimony now remains the same:

> I have absolutely no memory of my father ever having sexually abused me or inappropriately touching me in any way whatsoever. I believe that if my father had in fact engaged in the type of sexual abuse described in [Krause's] reports and in the charges brought against my father I would remember such actions.

Dkt. 168–6 at 4. She subsequently testifies once again: "I know that it did not happen." *Id.* at 5. Kathryn further testified that contrary to Krause's reports, she felt "uncomfortable" with Krause and found the anatomical "dolls" "disgusting," rather than fun to play with. *Id.* at 7. She also stated that Krause "was a stranger to me and she got me to agree with what she was telling me by rewarding me at the end of each session" by giving her treats, such as sodas, ice cream, a sundae and hot chocolate. *Id.* at 6–8 and 13.

Based in part on the facts set forth above, Kathryn disputes that she told Shirley she was abused and testified she would never even have used the words Shirley attributed to her. Dkt. 168 at 20. However, Mr. Spencer presents no evidence disputing that Kathryn was not interviewed by Detective Flood. Further, Detective Flood's report indicates that Kathryn did tell him all the things that Shirley reported, thus corroborating that abuse had occurred. Nonetheless, Flood also indicates that Kathryn "did tell Shirley everything that Shirley advised me of but then when asked to explain it or asked specific questions about it, [Kathryn] would say that she couldn't remember the words so she couldn't tell me." Dkt. 158 at 11. Flood's report is vague in terms of what Kathryn reported to him, it lacks any specific detail as to the words she used to described the abuse, and it indicates Kathryn had a problem actually explaining any specifics because she could not remember the words. *Id.*

Additionally, in Krause's reports, there are many quoted statements that purportedly reflect exactly what Kathryn described as the abuse that was perpetrated by her father. However, some of the vocabulary in the quotations is similar to that which was used in Shirley's written report regarding Kathryn's alleged disclosures of abuse to her, disclosures Kathryn disputes that she ever made to Shirley, in part contesting the specific type of language used to describe the alleged incidents. *See supra.*

Similarly, the quoted language in Krause's reports, which depicts Kathryn as describing in graphic detail sexual acts performed by her father, is inconsistent with Kathryn's testimony that Krause would "[get] me to agree with *what she was telling me*" (emphasis added), indicating that Krause was making the quoted statements and Kathryn would agree with either some or all of them, rather than Kathryn herself providing the graphic de-

tails of the alleged abuse and Krause simply quoting her.

As the above paragraphs demonstrate, a genuine issue of material fact exists (1) because of the vagueness of Flood's report combined with Kathyrn's testimony denying that she disclosed abuse to Shirley and she would have used the vocabulary Shirley attributed to her; (2) that the information and some of the vocabulary that Kathryn denies having said to Shirley was similar to what Kathryn allegedly reported to Krause; and (3) that Kathryn denies making the statements she is quoted as saying to Krause. Therefore, construing all reasonable inferences in favor of the non-moving party, the evidence shows a genuine issue of material fact as to whether Krause fabricated evidence, which requires the jury to make credibility determinations about who they believe is being truthful. *Costanich,* 627 F.3d at 1111 ("We have previously held that when genuine issues of material fact arise regarding fabrication of evidence in a child abuse investigative report, a police officer is not entitled to qualified immunity because [c]redibility is an issue for the trier of fact") (internal quotation and citation omitted). Thus, the Court cannot grant qualified immunity on the basis that Krause did not fabricate evidence because of the alleged deliberate misquotations or misrepresentations of what Kathryn conveyed to Shirley and Krause. *Costanich,* 627 F.3d at 1111–1112.

#### b. Matthew

Spencer argues in part that Matthew's deposition testimony indicates a genuine issue of material fact exists as to whether Krause deliberately fabricated evidence in the investigative reports, as Matthew has specifically testified that he did not make the statements attributed to him. Dkt. 166 at 17. Krause interviewed Matthew on October 17, 1984, which records alleged statements made by Matthew, in part through the use of quotations. Dkt. 168–5. In Matthew's November 13, 2012 deposition, he refutes not only the accuracy of Krause's reports but also testifies that much of the content of her report was not truthful. *See* Dkt. 168–5. For example, during the deposition counsel went through many of the quotations included in Krause's October 17, 1984 report, and Matthew testified that whole statements were not his. *See, e.g.,* Dkt. 168–5 at 50 and 51. This report does not include any allegations that Mr. Spencer molested Matthew or that Matthew witnessed Mr. Spencer sexually abusing Kathryn. *See* Dkt. 168–5 at 51–61. However, Matthew testified that, during the interview, Krause "insisted that I was molested by my father." *Id.* at 10.

Krause's March 25, 1985 report indicates that during her interview with Matthew on that same day, Matthew, then age nine, made allegations of abuse against his father. *See* Dkt. 168–5 at 62–75. Again, to indicate what Matthew conveyed to her, Krause used many quotations to reflect phrases or statements Matthew made relevant to the alleged abuse. For example, she quotes him as stating that his father "put his penis in my bottom and in Kathryn's bottom and in Kathryn's front hole and he puts it in Little Matt's, [Hansen], bottom, and that really hurts us, and I hate him." Dkt. 168–5 at 68. Krause also quotes Matthew as describing how his father forced them to touch each other, for example, by stating, "He sticks his penis in our bottoms and he makes us stick our fingers in each other's bottoms, and he always makes us lick on Kathyrn." *Id.* at 69. Similarly, Krause quotes Matthew as stating, "Me and Little Matt, [Hansen], have to put our penises in Kathryn's bottom, and in her vagina." *Id.* Krause also quotes Matthew as describing how his fa-

ther forced them all to have oral sex with him; according to Krause, Matthew said, "I have to suck his penis. We all have to do that." *Id.*

During Matthew's November 13, 2012 deposition, he denies that the statements attributed to him in Krause's March 25, 1985 report are true. *Id.* at 14. After reviewing the statements attributed to him that are in her report, Matthew testified: "None of these are true. My father did not molest me so these are not true." *Id.* He also testified that "I didn't know what those words were. I don't know what a vagina is at age 8, I don't know what a penis is at age 8." *Id.* at 17. Matthew further testified that many, if not all, the statements in Krause's March 25, 1985 report were Krause's words not his. *See, e.g.,* Dkt. 168–5 at 43–49. Instead, Matthew testified that he did not describe sexual events to Krause, rather she described them to him, and he indicated that at least some, if not most, of the quotations in the report were what Krause told him and, ultimately, he just agreed. *Id.* at 49 and 167.

However, as Krause correctly observes in her response brief, Matthew's deposition testimony is inconsistent with his prior sworn testimony under oath at a hearing and a prior declaration. Dkt. 171 at 7–8.

> While Matthew Spencer does now deny that abuse occurred, he has flatly contradicted himself under oath on multiple occasions regarding the disclosures of abuse he made to Ms. Krause as documented in her reports. He swore under oath in his recantation Declaration (Dkt. 140–5, P. 34 of 48, lns. 14–16 (emphasis added)): "While I believe that I did tell her the things written in the report attributed to me about my father sexually abusing me, none of it is true." Yet in his sworn deposition testimony (Docket 140–5, P. 29 of 48, ln. 12–P. 30 of 48, ln.

> 6 (emphasis added)) Matt Spencer testified: "Well, I didn't tell her the things written. They were told to me and I agreed to them." He also testified, however, that he did tell Ms. Krause of abuse "in detail," including "that [plaintiff] put his penis in my butt, that I put my penis in his butt." Dkt. 168–5, P. 14 of 75, ln. 23–P. 16 of 75, ln. 18. Making this contradiction worse, Matt Spencer's Declaration concluded with the affirmative representation under oath that "I have carefully reviewed every line of this declaration for accuracy. It is all true to the best of my knowledge and I am willing to go to court and swear to these facts before a judge." Docket 140–5, page 35 of 48, lines 13–16 (emphasis added). Yet when asked in his deposition why he didn't clarify in his recantation Declaration that he claims he never told Ms. Krause about the abuse but only agreed with what she told him, he said of his review of the declaration before signing: "I scanned it. Q. What does that mean? Did you or didn't you read it from start—A. I didn't study it no. I didn't study it." Dkt. 140–5, P. 30 of 48, lns. 10–15 (emphasis added).

Dkt. 171 at 7–8.

There are inconsistencies in Matthew's recent testimony and between his recent testimony as well as his prior testimony and declaration; these inconsistencies may indeed undermine his credibility. However, whether Matthew is to be believed, to what extent, or as to what subject matter is for a jury to determine. The Court finds there is a genuine issue of material fact as to whether Krause deliberately misquoted or misrepresented the alleged statements of Matthew. Thus, because there is a genuine issue of material fact as to whether or not she fabricated evidence,

Krause is not entitled to qualified immunity.

#### c. Hansen

Unlike Kathryn or Matthew, Hansen has not recanted his allegations of sexual abuse.[3] Nor is there any deposition or other testimony from Hansen accusing Krause of fabricating the information he supplied to Krause about his father sexually abusing him.

However, given that (1) Kathryn and Matthew have recanted the abuse allegations, even though Krause's report alleges that Hansen, at age four, stated that he witnessed Mr. Spencer abusing Kathryn and Matthew, and (2) there are genuine issues of material fact regarding whether Krause fabricated Kathryn and Matthew's allegations of abuse, there is also a genuine issue of material fact regarding whether Krause fabricated Hansen's allegations. *See, e.g.,* Dkt. 168–12 at 17–25. Thus, Krause is not entitled to qualified immunity with respect to whether she fabricated Hansen's allegations of abuse against Mr. Spencer.

### C. Probable Cause

 "Probable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." *Stoot v. City of Everett,* 582 F.3d 910, 918 (2009) (*citing Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (internal quotation marks omitted)); *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134

L.Ed.2d 911 (1996). Further, "[b]ecause many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable [people], acting on facts leading sensibly to their conclusions of probability." *Id.* (*citing Brinegar,* 338 U.S. at 176, 69 S.Ct. 1302).

 Probable cause is a complete defense to claims of false arrest, false imprisonment and malicious prosecution. *See Lassiter v. City of Bremerton,* 556 F.3d 1049, 1054–55 (9th Cir.2009).

 Because there are genuine issues of fact regarding whether Krause fabricated evidence in the child victims statements, which was, in large part, what the Prosecutor's Office relied on to find probable cause existed and to charge Mr. Spencer with multiple counts of abuse (Dkt. 168–11 at 11 and 14), the Court cannot grant qualified immunity on the basis that probable cause exists and must deny summary judgment on Krause's claims for false arrest, malicious prosecution and false imprisonment. *See supra.*

### D. Disclosures of Evidence

Krause argues she is entitled to qualified immunity for failure to disclose alleged *Brady* material. Dkt. 139 at 19–23. Mr. Spencer claims that Krause is not entitled to qualified immunity for failure to disclosure multiple items of *Brady* material. Dkt. 166 at 20. The items at issue are Roe's report, Kathryn's medical report, Hansen's medical report, and the videotaped interview of Kathryn. *Id.*

---

**3.** Krause argues that a declaration by Mr. Spencer's counsel, which attaches but does not authenticate notes prepared by an unidentified person which purport to contradict Hansen's 2009 sworn testimony that his fa-

ther in fact abused him, is inadmissible hearsay. Dkt. 171 at 6 n. 3. The notes referenced are inadmissible hearsay and are stricken pursuant to 56(c)(2).

### 1. Roe's Report

It is undisputed that the Prosecutor's Office possessed Roe's report. Further, as the Court has concluded, Mr. Spencer is collaterally estopped from litigating whether Roe's report was unconstitutionally withheld. *See supra.* Additionally, despite the fact that Krause was aware of Roe's report, Mr. Spencer provides no evidence or case law to support that the failure to disclose Roe's report in anyway creates § 1983 liability for Krause, even assuming Roe's report was exculpatory and admissible evidence.

### 2. Kathryn's Medical Report

As to the medical report of Kathryn, there is genuine issue of material fact as to whether the Prosecutor's Office ever had this piece of evidence. It is undisputed that Krause was aware of Kathryn's medical report and had it in her possession. Further, discrepancies exist between Krause's two evidence indices sent to the Prosecutor's Office in the Spencer case, the first of which documents the existence of Kathyn's medical report and the second of which deletes the report from the index. Dkts. 164–4 at 24 and 27. During her recent deposition, Krause was unable to account for the discrepancies in the indexes (Dkt. 168–4 at 8) and provided testimony effectively indicating that she was not sure whether Kathryn's medical report made it to the Prosecutor's Office. *See id.* at 9–10. The foregoing information is sufficient to create a genuine issue of material fact as to whether Kathryn has liability for failure to disclose Kathryn's medical report.

### 3. Hansen's Medical Report

With regard to Hansen's medical report, during a prior proceeding the Court found that the Sheriff's Office never received a copy of his medical report. Dkt. 63–15.

Although Mr. Spencer presents some evidence indicating that, while the Sheriff's Office did not receive the report, Krause was aware of the report's existence (Dkt. 166 at 20). Shirley testified that Krause recommended Hansen be examined. *Id.* Krause admits her normal practice was to refer parents to have their children examined. Dkt. 168–3 at 4 (May 22, 1996 Habeas Deposition of Sharon Krause). In a prior proceeding, Shirley was asked whether, as a part of the investigation, she was referred to take Hansen to have a medical exam. Shirley responded affirmatively and indicated that "Sharon Krause" "told her to go." Dkt. 168–15 at 40 (June 4, 1996, Habeas Deposition of Shirley Spencer). Additionally, in her deposition, Shirley testified to the following:

> Q. Did you discuss with either Sergeant Davidson or Detective Krause the fact that Matt had been examined?
>
> A. I'm sure I did because they told me to go.
>
> Q. Do you remember signing any kind of a release or a waiver for the Clark County Sheriff's office to allow them to get Matt's medical records?
>
> A. I don't remember it, but I probably would have if they'd asked me to, but I don't remember it.

Dkt. 168–15 at 41.

In Shirley's more recent deposition, she confirms that Krause told her to take Hansen in for a medical exam, and she did so (Dkt. 140–1 at 52–53). She also testified that she told Krause she had taken Hansen for an exam, but Shirley indicates that she didn't have the medical report and stated, "Well, I didn't know the medical findings. I just said [to Krause] I had taken him. And all I know is what [the doctor] said that it was hard to tell [if Hansen was abused], but he didn't tell me the results." *Id.* at 53. However, this time, Shirley testifies that she didn't know

if Davidson knew about the medical exam. *Id.*

If Krause followed her usual practice and she and Shirley did indeed talk about the results of the exam, Krause would have been aware that a doctor would have produced some record of Hansen's examination, as Krause dealt with child sexual abuse cases regularly. That Krause apparently did not collect the report itself, as it was not in the possession of the Sheriff's Office, but rather Krause just listened to whatever Shirley told her, could lead a reasonable juror to infer that Krause deliberately failed to collect relevant evidence that was common place for detectives to review in child abuse cases.

#### 4. Videotaped Interview of Kathryn

It is undisputed that the videotaped interview of Kathryn by Peters was not disclosed to the defense and was stored in Krause's garage. Although Peters was aware of videotape's existence, neither Peters nor Krause have any independent memory about what happened to it after the interview.[4] Dkts. 140–5 at 44– and 140–2 at 9. As Krause notes, she "testified that she has no knowledge or recollection of the whereabouts of the tape until she discovered it in a box of materials in her garage in 2009 which were included materials she packed up and took with her when she retired in 1995, that she immediately viewed it and called Clark County Deputy Prosecutor Denny Hunter to report its existence, and mailed the original to Mr. Hunter the same day." Dkt. 139 at 21 (*citing* Dkt. 140–2 at 9–10).

Given the above, there is a genuine issue of material fact as to (1) whether Krause failed to disclose the videotaped interview of Kathryn Spencer, as that item could

reasonably be construed as exculpatory evidence, even if cumulative of evidence already disclosed, and (2) the medical reports of Kathryn and Hansen, items that arguably have exculpatory value for Mr. Spencer. Thus, qualified immunity is denied.

#### E. Conspiracy

 A conspiracy in violation of § 1983 requires proof of: (1) an agreement between the defendants to deprive the plaintiff of a constitutional right; (2) an overt act in furtherance of the conspiracy; and (3) an actual deprivation of constitutional rights resulting from the agreement. *Avalos v. Baca,* 596 F.3d 583, 592 (9th Cir.2010); *Gausvik v. Perez,* 239 F.Supp.2d 1047, 1052 (E.D.Wash.2002). Although the agreement or meeting of the minds need not be overt but can be based upon circumstantial evidence, some admissible evidence as opposed to speculation is required to support the conspiracy claim and each participant must share the common objective of the conspiracy. *Crowe v. County of San Diego,* 608 F.3d 406, 440 (9th Cir.2010).

 Mr. Spencer's theory is that Krause conspired with Davidson for the common purpose of imprisoning him, and Krause continued the investigation when she knew he was innocent to "further her career" and to "avoid civil liability for fabricating Kathryn's allegations." Dkt. 166 at 4. Mr. Spencer assigns to Davidson a different motive for conspiring to imprison him, i.e. so he could pursue his romantic relationship with Mr. Spencer's then-wife, Shirley. *Id.* at 4.

Krause maintains there is no genuine issue of material fact as to whether she

4. In the Court's order on Peter's motion for summary judgment, it found Peters was entitled to absolute immunity for the interviewing of Kathryn Spencer and for failure to disclose that item of evidence. *See* Dkts. 174 and 179.

conspired with Davidson to imprison Mr. Spencer. Dkt. 139 at 5–7. Krause argues there is no direct evidence of conspiracy, and "[j]ust as it is not reasonable or rational to infer an intent to conspire to further a love interest which does not exist [between Davidson and Shirley], it is not reasonable or rational to infer that law enforcement officer or prosecutor would conspire to frame an innocent man based upon a belief that doing so would somehow enhance their career." *Id.* at 6–7. Thus, according to Krause, the conspiracy claim should be dismissed. *Id.* at 7.

According to the uncontroverted testimony of Shirley, she and Davidson met on September 21, 1985, when Mr. Spencer took his first polygraph test. Dkt. 168–1 at 12. Based on past and recent deposition testimony and responses to interrogatories, Krause has provided some equivocal testimony as to when she first knew of Davidson and Shirley's relationship. Krause has testified that "My recollection of [the relationship] is that when I became aware of that, it was long after I interviewed Little Matt. And I don't remember if it was before [Mr. Spencer] pled or after, to be honest with you." Dkt. 168–3 at 10 (May 22, 1996 Habeas Deposition of Shirley Spencer). In a recent set of interrogatories to Krause, however, she is able to definitively recall when she found out about the relationship: Krause states "There is absolutely no doubt in my mind that if at any time during the Spencer investigation I became concerned or aware that the relationship between Michael Davidson and Shirley Spencer was anything other than professional, I would have responded in the same way I did in the past, and would have immediately reported it to the Sheriff." Dkt. 140–1 at 5. Krause's recent deposition testimony on the same topic is consistent with the answer that she provided in her interrogatories regarding the relationship between Davidson and Shirley. Dkt. 140–2 at 58 and 59.

According to Mr. Spencer, after his February arrest, when he was in the county jail, Davidson made unwanted visits to him on multiple occasions, once told Mr. Spencer that Shirley no longer loved him, and also almost got into a physical confrontation with Mr. Spencer. Dkt. 168–2 at 20–22 (November 12, 2012 Deposition of Mr. Spencer). Lynda Harper ("Harper"), a former employee of the Sheriff's Office, states that she "recalls one officer in particular, whose name I cannot recall who came to see Mr. Spencer on a number of occasions." Dkt. 168–15 at 29 (Declaration of Lynda Harper). Among other memories, she also recalls that Mr. Spencer did not want to see this officer at times, and that there was a problem with this officer continually coming to see him. *Id.* Davidson testified that he does not recall ever visiting Mr. Spencer in jail. *See, e.g.,* Dkt. 168–15 at 12 (July 25, 1996 Habeas Deposition of Michael Davidson).

Sometime prior to March 15, 1985, Shirley has testified that she brought to the Sheriff's Office the quitclaim deed to the house in which she and Mr. Spencer lived. Dkt. 168–1 at 13. As Krause observes, in Shirley's deposition, she testifies that it was Davidson, not Krause who took the deed to Mr. Spencer. Regarding the deed, Shirley testified:

> A: I was [at the Sheriff's Office]. I gave it to Sharon. Sharon asked Mike if he would take it up. He took it up. He came back and gave it back and said he wouldn't sign it.

> \* \* \*

> Q. At any other time are you aware of whether Sharon Krause or—whether Sharon Krause got any documents in to Ray Spencer at the jail?
> A. I have no clue.

Dkt. 138–2 at 13. However, on March 15, 1985, the deed was signed and notarized. Dkt. 168–15 at 34–37. Mr. Spencer maintains that his signature on the deed was forged. *Id.* at 33. Additionally, Marina Landrum, the notary public employed by the Sheriff's Office from 1971 to 1991, was also unable to verify her signature on the deed. Dkt. 147 at 1. In her declaration, Landrum indicates that she has no memory of ever being called up to the jail to notarize the signature of an inmate on a quitclaim deed or any other document. *Id.*

In June 1985, Shirley filed for divorce from Mr. Spencer. Dkt. 168–1 at 26. Davidson and Shirley have testified that their relationship began in June 1985 after Mr. Spencer entered his plea, on May 16, 1985 (Dkt. 63–7), when they started seeing each other socially. Dkts. 168–1 at 25 (November 6, 2012 Deposition of Shirley Spencer) and 140–1 at 15 (November 5, 2012 Deposition of Michael Davidson). They have testified that they moved in together in the fall of 1985. Dkt. 168–1 at 24 and 140–1 at 15.

While the record does not reveal direct evidence contradicting Shirley and Davidson's testimony about when their relationship began, it does demonstrate some circumstantial evidence that, when viewed in a light most favorable to the non-moving party, could lead a rational juror to infer that Shirley and Davidson were involved, even if not in a full-fledged romantic relationship, before June 1985. For example, the difference between Krause's testimony in the aforementioned depositions regarding when she became aware of their relationship, the contested testimony that Mr. Spencer was visited by Davidson multiple times or at least once regarding the quitclaim deed, and that the quitclaim indeed may contain forged signatures.

Given (1) that Davidson was Krause's supervisor, and thus he was a person who could potentially impact Krause's career, (2) that there is ambiguity about when Krause knew of Davidson's relationship with Shirley, (3) that Davidson and Shirley were involved at least by June 1985 and moved in together that fall, (4) that there are genuine issues of material fact as to whether Krause fabricated evidence against Mr. Spencer as well as deliberately concealed exculpatory evidence,[5] and construing all reasonable inferences in favor of the non-moving party, the Court finds there is a genuine issue of material fact as to whether Davidson and Krause conspired to imprison Mr. Spencer.

## F. Proximate Cause

Because there are genuine issues of material fact as to whether Krause fabricated evidence and engaged in a conspiracy to imprison Mr. Spencer, a genuine issue of material fact also exists regarding whether or not Krause was a proximate cause of his alleged injuries.

## IV. ORDER

Therefore, it is hereby **ORDERED** that Krause's motion for summary judgment (Dkt. 139) is **GRANTED in part** as to the qualified immunity for (1) failure to disclose Roe's report, (2) conspiring to conceal such evidence, (3) using coercive interview techniques, and (4) conspiring to use coercive interview techniques for the purposes of framing and imprisoning Mr. Spencer or for any other purpose. Those claims are **DISMISSED with prejudice.** Krause's motion **is DENIED in part** as to the remainder of claims.

---

**5.** Fabrication of evidence and deliberately concealing exculpatory evidence are actions which, if true, could qualify as overt acts in furtherance of a conspiracy.

ORDER DENYING IN PART MOTION FOR PARTIAL RECONSIDERATION, REQUESTING ADDITIONAL BRIEFING, AND RENOTING MOTION

This matter comes before the Court on Defendant Sharon Krause's ("Krause") motion for partial reconsideration (Dkt. 181). The Court has considered the pleadings filed in support of the motion and the remainder of the file, and hereby denies the motion in part, requests additional briefing, and renotes the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

On January 16, 2013, Krause filed a motion for summary judgment. Dkt. 139. On March 21, 2013, Spencer filed a response in opposition to Krause's motion. Dkt. 166. On April 12, 2013, Krause filed a reply brief. Dkt. 171. On August 21, 2013, the Court issued an order granting in part and denying in part Krause's motion for summary judgment. Dkt. 180. On September 9, 2013, Krause filed the instant motion for partial reconsideration of the Court's order on her motion for summary judgment. Dkt. 181.

## II. DISCUSSION

Motions for reconsideration are governed by Local Rule CR 7(h), which provides as follows:

> Motions for reconsideration are disfavored. The court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence.

Local Rule CR 7(h)(1).

Krause asks that the Court reconsider three of its rulings: (1) that Krause can have 42 U.S.C. § 1983 ("section 1983") liability for failure to disclose the videotaped interview of Kathryn Spencer ("Kathryn"), when her duty was to disclose it to the prosecution; (2) that she has any section 1983 liability for failure to disclose the medical reports; and (3) that there is a reasonable inference Krause fabricated Matthew Hansen's ("Hansen") allegations of abuse.

## A. Duty to Disclose Interview Tape & Roe's Report

As to the first issue, based on this Court's review of *Tennison v. City of San Francisco*, 570 F.3d 1078, 1087 (9th Cir. 2009), and the cases cited therein, the Court finds that Krause's argument may indeed have merit. She maintains that her duty was to the disclose evidence to the prosecutor, and it is the prosecutor's duty to disclose to the defense. Dkt. 181 at 1–2. If this is correct under the law, as it appears to be, then Krause is entitled to dismissal of the claims involving evidence disclosed to the prosecutor.

## B. Collateral Estoppel as to the Medical Reports

With respect to Krause's argument that she has no section 1983 liability for failure to disclose the medical reports, the Court also finds that it may have merit. Krause is correct in some of her observations regarding the Court's prior orders about collateral estoppel and its application to Kathryn and Hansen's medical reports. Specifically, Krause quotes the following rulings from the Court's prior order on former Defendant James Peters's second motion for summary judgment, referencing its rulings on Defendants Michael Davidson and Krause's initial motions for summary judgment:

> [A]s the Court concluded in its order on Davidson and Krause's motions for

summary judgment, Mr. Spencer is collaterally estopped from relitigating the issues of whether the state unconstitutionally withheld Kathryn's medical report prior to his plea and whether Hansen's report, combined with Kathryn's medical report, would have caused Spencer to go to trial rather than plead guilty in violation of *Brady*. Dkts. 91 at 26–27 and 93 at 12–13.

Dkt. 97 at 9. Nothing in Mr. Spencer's responsive briefing alters the Court's prior conclusion. Although in a footnote the Court's previous order indicated that the preclusive impact of prior judgments should be carefully examined because factual issues such as when and how Hansen's medical report came to the Clark County Sheriff's Office had not necessarily been litigated and may be relevant to Mr. Spencer's claims (*see* Dkt. 97 at 10, n. 2) [and Dkt. 91 at 26, n. 2], *discovery on such factual issues would not alter the Court's legal conclusion that Mr. Spencer is collaterally estopped from relitigating these issues.*

Dkt. 181 (*citing* Dkt. 174 at 32–33). Thus, although the Court mentioned that the preclusive impact of prior judgments should be carefully considered because "factual issues such as when and how Hansen's" report arrived at the Sheriff's Office "may be relevant to Spencer's other claims," the Court did not mean that the "materiality" of the reports could be relitigated. *See supra.* In Krause's order, it appears that the Court erred in ruling that Krause should not be granted qualified immunity for her failure to disclose the medical reports. That ruling appears not to follow from the Court's prior rulings that Spencer is collaterally estopped from litigating the materiality of the reports. Krause cannot have section 1983 liability for failure to disclose *Brady* material when it has already been determined that certain undisclosed items at issue are not *Brady* material.

Nonetheless, even if the Court grants Krause's motion for reconsideration on this issue, Spencer is not necessarily precluded from introducing evidence at trial that Krause's awareness of the reports is relevant to Spencer's other section 1983 claims, assuming the reports are otherwise admissible. The introduction or admissibility of such evidence at trial, however, is not presently at issue.

## C. Fabrication of Hansen's Interview Reports

With regard to whether a genuine issue of material fact exists as to Krause's fabrication of Hansen's abuse allegations against Spencer, the Court found:

> Unlike Kathryn or Matthew [Spencer], Hansen has not recanted his allegations of sexual abuse. Nor is there any deposition or other testimony from Hansen accusing Krause of fabricating the information he supplied to Krause about his father sexually abusing him.
>
> However, given that (1) Kathryn and Matthew have recanted the abuse allegations, even though Krause's report alleges that Hansen, at age four, stated that he witnessed Mr. Spencer abusing Kathryn and Matthew, and (2) there are genuine issues of material fact regarding whether Krause fabricated Kathryn and Matthew's allegations of abuse, there is also a genuine issue of material fact regarding whether Krause fabricated Hansen's allegations. *See, e.g.,* Dkt. 168–12 at 17–25. Thus, Krause is not entitled to qualified immunity.

Dkt. 180 at 30–31 (footnote omitted).

Krause argues that the Court overlooked Hansen's March 6, 2012 declaration, in which Hansen affirms that as a child he was abused by Spencer and told

Krause as much. Dkt. 181 at 4. Defendants essentially maintain that had the Court considered that evidence, it would have found that Kathryn and Matthew's recantations and the material issues of fact regarding whether Krause fabricated their statements have no logical bearing on whether Krause fabricated Hansen's interview reports. *Id.* at 4–5. Defendants specifically argue that Kathryn and Matthew's recantations are irrelevant to whether Krause fabricated Hansen's statements. *Id.* at 5. Additionally, Spencer argues "[t]he fact that Ms. Krause reports that Matthew Hansen told her he saw plaintiff sexually abuse Kathryn and Matthew Spencer does not give rise to a reasonable inference that she fabricated these parts of Matthew Hansen's interview reports." *Id.* at 4–5.

Although this could be considered a close call, the Court ultimately finds that a genuine issue of material fact exists as to whether Krause fabricated some or all of Hansen's statements regarding the alleged abuse. The fact that Hansen submitted a sworn declaration indicating that, at age five, consistent with his 2009 testimony, he told Krause that he had been abused in the bath tub at home and at the Salmon Creek Motel (Dkts. 54 and 54-1), does not alone warrant dismissal of the claims, when that evidence is viewed in light of other evidence in the record. Rather, the trustworthiness of Hansen's declaration, when considered in combination with the recantations made by Kathryn and Matthew, as well as the Court's finding that there is a genuine issue of material fact as to whether Krause fabricated their statements, becomes a matter for the jury. In other words, whether Hansen's memory of what occurred as a four-year-old and what he reported to Krause as a five-year-old involves a question of reliability for the jury to consider, as there is some evidence that two other children of similar age and proximity to Spencer, allege fabrication of their statements regarding abuse. Thus, on this issue the Court finds that Krause's motion lacks merit.

## D. Additional Briefing

As the Court has indicated above, it finds that two of the three arguments Krause presents in her motion for partial reconsideration may have merit. Because the Court is considering granting Krause's motion for partial reconsideration on those issues, Spencer may respond to them.

## III. ORDER

Therefore, it is hereby **ORDERED** Krause's motion for partial reconsideration is **DENIED** as to whether there is a genuine issue of material fact that Krause fabricated the interview statements of Hansen, and the Court **RESERVES** ruling on the remaining issues until after the parties submit additional briefing on those issues. Spencer may file a responsive brief not to exceed seven pages regarding only the issues set forth above. The brief is due by September 20, 2013. Krause may file a reply brief not to exceed four pages by September 27, 2013. The motion for reconsideration is renoted to September 27, 2013.

## ORDER GRANTING IN PART KRAUSE'S MOTION FOR PARTIAL RECONSIDERATION

This matter comes before the Court on Defendant Sharon Krause's ("Krause") motion for partial reconsideration (Dkt. 181) and the parties' additional briefing on two issues requested by the Court in its prior order denying in part Krause's motion (Dkt. 182). The Court has considered the pleadings filed in support of and in opposition to the remaining issues in Krause's motion as well as the rest of the

file, and for the reasons stated herein, grants the motion in part.

## I. PROCEDURAL HISTORY

On January 16, 2013, Krause filed a motion for summary judgment. Dkt. 139. On March 21, 2013, Spencer filed a response in opposition to Krause's motion. Dkt. 166. On April 12, 2013, Krause filed a reply brief. Dkt. 171. On August 21, 2013, the Court issued an order granting in part and denying in part Krause's motion for summary judgment. Dkt. 180. On September 9, 2013, Krause filed the instant motion for reconsideration of the Court's order on her motion for summary judgment. Dkt. 181.

On September 17, 2013, the Court issued an order denying in part Krause's motion for partial reconsideration, finding that a genuine issue of material fact exists as to Krause's fabrication of Hansen's abuse allegations against Spencer. Dkt. 182 at 4–6. However, the Court found Krause's motion may have merit as to two issues: (1) that Krause cannot have 42 U.S.C. § 1983 ("section 1983") liability for failure to disclose the videotaped interview of Kathryn Spencer ("Kathryn"), when her duty was to disclose it to the prosecution; and (2) that she has no section 1983 liability for failure to disclose the medical reports of Kathryn and Matthew Hansen ("Hansen"). *Id.* at 2–4. Therefore, the Court provided Spencer an opportunity to respond to the potentially meritorious issues and Krause an opportunity to file a reply. *Id.* at 6.

On September 20, 2013, Spencer filed a response in opposition to Krause's motion for partial reconsideration. Dkt. 183. On September 27, 2013, Krause filed a reply. Dkt. 185.

## II. DISCUSSION

Motions for reconsideration are governed by Local Rule CR 7(h), which provides as follows:

Motions for reconsideration are disfavored. The court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence.

Local Rule CR 7(h)(1). Below the Court discusses the application of this standard to two of the three rulings that Krause urges the Court to reconsider.

### A. Duty to Disclose Interview Tape

■ As to the first issue, based on *Tennison v. City of San Francisco*, 570 F.3d 1078, 1087 (9th Cir.2009), and the cases cited therein, Krause argues that she cannot be held liable under section 1983 for failure to disclose the interview tape, or any other evidence, disclosed to the prosecutor. In keeping with *Tennison*, she maintains that her duty was to disclose the evidence to the prosecutor, and it is the prosecutor's duty to disclose to the defense. Dkt. 181 at 1–2 (*citing Tennison*, 570 F.3d at 1087 (a police officer's duty with regard to exculpatory evidence is to disclose to the prosecutor)).

In his response, Spencer does not contradict Krause's interpretation of *Tennison*, nor does he respond with an argument regarding *Tennison's* inapplicability to this case, or discuss the cases cited therein. *See* Dkt. 183. Instead, Spencer submits new argument and additional evidence in an attempt to show that Peters had no knowledge that the videotaped interview of Kathryn existed. Dkt. 183 at 2. Krause moves to strike the additional evidence submitted by Spencer, Kathleen T. Zellner's Declaration with attached Exhibits A–F. Dkt. 185 at 3–4. Krause correctly observes that pursuant to Western District Local Rule 7(h)(3), Spencer should have

confined his response to seven pages, as the Court set forth in its prior order on this motion. *Id.* at 3. Any facts that Spencer needed to cite in his response should have been done through reference to the voluminous documents already in the record. Therefore, the Court grants Krause's motion to strike Zellner's declaration and any references to it within Spencer's response. Striking this declaration and Spencer's references to it, leaves the Court without any facts to consider in support of Spencer's new arguments and thus no meritorious opposition to Krause's motion regarding the disclosure issue. However, even if the Court did not strike the declaration, it would still find that Spencer's arguments about Krause's liability for failure to disclose the videotaped interview of Kathryn to the prosecution is without merit as addressed below.

In stark contrast to his prior position, Spencer now goes as far as to argue that Peters had no actual or constructive knowledge of the videotape's existence, nor did Peters have actual or constructive possession the videotape. *Id.* at 2–6. Spencer also now argues that Peters could not have known the exculpatory value of the tape. *Id.* at 6–7. Spencer's new arguments on reconsideration may be summarized by a section of his brief:

> Krause concealed the videotape from Peters and the other prosecutors prior to Plaintiff's guilty plea. It is well-established that a detective's duty "is simply to collect the evidence and to disclose all of it to the prosecutor," and it is the prosecutor "who then makes the discretionary legal judgment about its material exculpatory attributes." *Jean v. Collins,* 221 F.3d 656, 669 (4th Cir.2000). By concealing the videotape, Krause deprived any and all prosecutors from

making such a discretionary legal judgment and disclosure to Plaintiff.

Dkt. 183 at 7.

Spencer's new arguments contradict his former position that Peters knew of the tape and together with Krause and Davidson conspired to deliberately conceal it, from the time it was made, through Spencer's habeas proceedings, and up to 2009 when it was found in Krause's garage. *See, e.g.,* Dkts. 167 at 12 (Spencer argues that Peters and Krause were undisputably aware of the videotape and were conspiring to conceal it) and 176 at 7 (Spencer argues that Peters has been concealing the videotape since it was made and through Spencer's habeas proceedings). Spencer's contention that Peters could not have known the exculpatory value of the videotape also runs counter to the theory that Peters and Krause were conspiring to imprison Ray for the purposes of furthering and protecting their careers. Spencer's theory has consistently been based in part on the premise that Peters and Krause continued to conceal the videotaped interview of Kathryn (as well as fabricate other corroborating evidence of guilt) partially because Peters knew the videotape's contents were exculpatory and would reveal that they had mistakenly charged Spencer with the abuse of Kathryn and were continuing to prosecute a person who they knew was innocent, thus subjecting them to civil liability and potentially ruining their careers. *See, e.g.,* Dkt. 167 at 12–17.

Despite Spencer's new assertions, there is no genuine issue of material fact as to whether Peters knew the interview was being videotaped. Peters's position that he "forgot" about the tape (Dkt. 168–14 at 21) means that he knew of it but did not remember it. Based on the evidence in the record, Peters has never testified that he had no knowledge that interview was recorded on videotape. In fact, during his

deposition, Peters indicated that his interview of Kathryn was the only time he videotaped a child interview, so "the fact of the video interview stuck out in his mind." Dkt. 168 at 30. Once Peters's interview with Kathryn was complete, whether he chose not to review the interview that he had videotaped, decided not to put it into the prosecutor's file, or failed to disclose to the defense is now irrelevant. This Court has determined that "Peters is absolutely immune from his conduct related to the December 11, 1984 interview with Kathryn," including the failure to disclose evidence related to that interview. Dkts. 174 at 30 and 179 at 4. Although Krause was apparently present for a portion of the interview, due to Peters's awareness of the videotape, as Spencer argues (Dkt. 183 at 7), it would have been his duty to review it, make the legal determination regarding its exculpatory value and disclose it to the defense.

Finding that Krause could have section 1983 liability for failure to disclose the videotaped interview was manifest error. Based on the facts of this case, she did not have such a duty. Reconsideration is granted as to this issue, and thus Krause's motion for summary judgment is granted as to this claim.

**B. Collateral Estoppel as to the Medical Reports**

With respect to Krause's argument that she has no section 1983 liability for failure to disclose the medical reports, the Court also finds it meritorious. Krause is correct in some of her observations regarding the Court's prior orders about collateral estoppel and its application to Kathryn and Hansen's medical reports. Specifically, Krause quotes the following rulings from the Court's prior order on former Defendant James Peters's second motion for summary judgment, referencing its rulings on Defendants Michael Davidson and Krause's initial motions for summary judgment:

> [A]s the Court concluded in its order on Davidson and Krause's motions for summary judgment, Mr. Spencer is collaterally estopped from relitigating the issues of whether the state unconstitutionally withheld Kathryn's medical report prior to his plea and whether Hansen's report, combined with Kathryn's medical report, would have caused Spencer to go to trial rather than plead guilty in violation of *Brady*. Dkts. 91 at 26–27 and 93 at 12–13.

Dkt. 97 at 9. Nothing in Mr. Spencer's responsive briefing alters the Court's prior conclusion. Although in a footnote the Court's previous order indicated that the preclusive impact of prior judgments should be carefully examined because factual issues such as when and how Hansen's medical report came to the Clark County Sheriff's Office had not necessarily been litigated and may be relevant to Mr. Spencer's claims (*see* Dkt. 97 at 10, n. 2) [and Dkt. 91 at 26, n. 2], discovery on such factual issues would not alter the Court's legal conclusion that Mr. Spencer is collaterally estopped from relitigating these issues. Dkt. 181 (*citing* Dkt. 174 at 32–33). Thus, although the Court mentioned that the preclusive impact of prior judgments should be carefully considered because "factual issues such as when and how Hansen's" report arrived at the Sheriff's Office "may be relevant to Spencer's other claims," the Court did not mean that the "materiality" of the reports could be relitigated. *See supra.* In its prior order, the Court manifestly erred in ruling that Krause should not be granted qualified immunity for her failure to disclose the medical reports. Krause cannot have sec-

tion 1983 liability for failure to disclose *Brady* material when it has already been determined that certain undisclosed items at issue are not *Brady* material.

Spencer does not argue against collateral estoppel, and nothing in his responsive brief demonstrates that the Court should rule that collateral estoppel should not apply. *See* Dkt. 183. Contrary to Spencer's argument, there is no evidence of any other *Brady* material that Krause has liability for failing to disclose; therefore, Spencer cannot argue that the "cumulative impact" of such evidence creates liability for Krause. Dkt. 183 at 7.

Reconsideration is granted as to this issue, and Krause's motion for summary judgment is granted as to this claim.

Therefore, it is hereby **ORDERED** that Krause's motion for reconsideration (Dkt. 181) is **GRANTED in part.**